EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Anthony Cintrón Román<br><br>Recurrido<br><br><br>v.<br><br>Charline Michelle Jiménez Echevarría por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>Peticionaria | Certiorari<br><br>2023 TSPR 59<br><br>211 DPR \_\_\_ |

Número del Caso: CC-2023-0049

Fecha: 2 de mayo de 2023

Tribunal de Apelaciones:

　　　Panel X

Abogado de la parte peticionaria:

　　　Lcdo. Osvaldo Burgos Pérez

Abogadas de la parte recurrida:

　　　Lcda. María del C. Jiménez Aquino
　　　Lcda. Pilar Pérez Rojas

Materia: Resolución del Tribunal con Votos Particulares de Conformidad y Votos Particulares Disidentes.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Anthony Cintrón Román<br><br>Recurrido<br><br>v.<br><br>Charline Michelle Jiménez Echevarría por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>Peticionaria | CC-2023-0049 | Certiorari |

RESOLUCIÓN

En San Juan, Puerto Rico, a 2 de mayo de 2023.

Examinada la petición de *Certiorari*, se declara no ha lugar.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió un Voto particular de conformidad. La Jueza Asociada señora Pabón Charneco emitió un Voto particular de conformidad, al cual se unen el Juez Asociado señor Rivera García y el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Kolthoff Caraballo emite las siguientes expresiones de conformidad:

> "Al igual que la inmensa mayoría de los puertorriqueños, vivo agradecido a Dios por mi madre, y porto su apellido con orgullo como mi segundo apellido. Y si la costumbre en nuestra sociedad hubiera sido que a los puertorriqueños se nos inscribiera con el apellido de la progenitora en primer orden, nos hubiéramos

acostumbrado a eso, y los sistemas sociales estuvieran tan adaptados que yo me cuestionaría la sabiduría de que comenzara a permitirse el intercambio de tal orden, que es la controversia central en este caso.

Ahora bien, independientemente de lo que yo entienda es sabio o no, la realidad es que en Puerto Rico las personas autorizadas en ley para solicitar la inscripción de una criatura pueden ponerse de acuerdo para establecer en qué orden aparecerán los apellidos de tal criatura. Es en ausencia de un acuerdo que la costumbre, como fuente de derecho demanda y ante la inexistencia de una ley que establezca otra cosa, que el apellido del varón se coloque en primer lugar.

Con relación al llamado de erradicar "una costumbre con orígenes patriarcales que propende al discrimen contra la mujer, que atenta directamente contra la ley y violenta múltiples garantías constitucionales" (Voto particular disidente del Juez Asociado señor Estrella Martínez, págs. 3-4), es importante recordar, en primer lugar, que este Tribunal está sujeto al límite constitucional que establece la separación de poderes de nuestra forma republicana de gobierno. Por eso, en este caso no nos corresponde "erradicar una costumbre", sino, sujetarnos a lo que establece el Código Civil y aplicar la costumbre como la tercera en el orden jerárquico de las fuentes del ordenamiento jurídico, "en ausencia de ley aplicable, si no es contraria a la moral o al orden público y si se prueba su espontaneidad, generalidad y constancia". Arts. 2 y 4 del Código Civil, 31 LPRA secs. 5312 y 5214.

Además, la pretensión de erradicar una costumbre que claramente cumple con los parámetros que establece el Art. 4 del Código Civil, *supra*, choca con lo siguiente: En nuestro sistema de derecho, para que se pueda reconocer un discrimen primero hay que identificar un derecho que claramente se le otorga a un ciudadano que no se le está reconociendo a otro, a pesar de encontrarse bajo las mismas condiciones. O sea, el derecho constitucional a la igual protección de las leyes "se activa cuando nos enfrentamos a **una legislación o a una acción estadual** que crea clasificaciones entre grupos, discriminando a unos frente a otros." *Berberena v. Echegoyen*, 128 DPR 864, 878 (1991).

En este caso no se le ha reconocido a nadie, sea hombre o mujer, un derecho a que su hijo o hija porte primero su apellido. Esto es, **no existe una ley, reglamento o acción del Estado** que le conceda ese derecho a uno y que pudiera interpretarse que se le niega a otro, a pesar de estar en igual condiciones. Precisamente en eso estriba la corrección de la sentencia del distinguido Panel del Tribunal de Apelaciones. Es ante ese vacío que correctamente la sentencia apelada acude a nuestras fuentes del derecho y, en específico a la costumbre, conforme se establece en el Código Civil de 2020.

En otras palabras, para que una costumbre sea ilícita (*contra legem*) se requiere la existencia de una ley que establezca un principio o interés que pueda interpretarse en contra de dicha costumbre. En esos casos, el propio Art. 4 del Código Civil, *supra*, descarta tal costumbre como fuente de derecho. Sin embargo, en el caso de autos no existe una ley, reglamento o acción del estado **que imponga una jerarquía en el orden de los apellidos con el que ha de inscribirse a una criatura**, por lo que la doctrina constitucional firmemente establecida no permite declarar la existencia de un discrimen, pues este únicamente se da ante acciones del Estado. En todo caso, tal desigualdad, si alguna, tiene que ser resuelta por la Asamblea Legislativa".

La Jueza Presidenta Oronoz Rodríguez emitió un Voto particular disidente y a su vez hace constar la siguiente expresión:

"Me causa gran pesar que no hayamos alcanzado un consenso para expedir el recurso de epígrafe y así revocar la Sentencia —errada por demás— del Tribunal de Apelaciones. La controversia que nos correspondía atender es sencilla, pero de consecuencias trascendentales. Ante el desacuerdo de un padre y una madre sobre el orden de los apellidos de su criatura, ¿qué procede hacer? Ni el Código Civil de 2020 ni la Ley del Registro Demográfico establecen un orden preferencial, y ciertamente no prohíben que el apellido de la madre vaya primero.

Trabada la controversia, el Tribunal de Apelaciones entendió que la solución era recurrir a la fuente de derecho de la "costumbre" para

validar la práctica habitual de anteponer el apellido del padre al de la madre. Este "remedio", además de ser patentemente sexista y estar anclado en nociones androcéntricas, constituye, sin lugar a duda, **un discrimen prohibido por nuestra Constitución**. La respuesta brindada por el foro intermedio se basó, <u>única y exclusivamente</u>, en el género de las personas implicadas. **Esto es contrario a los postulados que preceptúa nuestra *Carta Magna* sobre la inviolabilidad de la dignidad humana.**

Como muy bien ha expresado esta Curia, **"nuestro sistema constitucional protege al ciudadano puertorriqueño contra todo acto de discrimen por razón de su género"**. <u>López Fantauzzi v. 100% Natural</u>, 181 DPR 92, 114 (2011) (Énfasis suplido). Véase: Art. II, Constitución de Puerto Rico, LPRA, Tomo 1. Siendo ello así, ¿puede una "costumbre" con bases en el discrimen ser fuente jurídica para la solución de una controversia de Derecho? Claramente, no. No solamente porque no representa los valores modernos imperantes en nuestra sociedad, **sino porque es diametralmente opuesta a los principios que inspiraron la adopción de nuestra Ley Superior.**

El error del Tribunal de Apelaciones es más evidente cuando consideramos que el Tribunal de Primera Instancia, ante el mismo vacío estatutario, adoptó una solución justiciera y no discriminatoria.

A pesar de que considero firmemente de que debimos intervenir para corregir el error desafortunado del foro intermedio y, de esta forma, erradicar todo vestigio de discrimen de género, **al menos me consuela la esperanza de que 6 integrantes de esta Curia coinciden en que el fundamento machista, antijurídico y discriminatorio que sustentó la Sentencia del Tribunal de Apelaciones <u>no puede prevalecer</u>.**

Confío que en una controversia futura similar lo hagamos mejor".

El Juez Asociado señor Estrella Martínez emitió un Voto particular disidente. El Juez Asociado señor Colón Pérez emitió un Voto particular disidente.


                         Javier O. Sepúlveda Rodríguez
                          Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Anthony Cintrón Román<br><br>Recurrido<br><br>v.<br><br>Charline Michelle Jiménez Echevarría por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>Peticionaria | CC-2023-0049 | |

Voto particular de conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 2 de mayo de 2023.

En este caso se nos pide que resolvamos que una práctica que recoge un uso y costumbre centenario es inconstitucional y contraria al orden público. Los principios de autolimitación judicial recogen los límites de nuestro poder según la Constitución. Aun así, y aunque el legislador ha guardado silencio sobre el asunto que nos ocupa, se nos solicita que estiremos nuestro poder, para declarar que el orden público existente es contrario… ¡al orden público! Como siempre, ante la ausencia de ley o de una violación constitucional, rechazo esa invitación. Este asunto está en

manos de la Asamblea Legislativa, si esta entiende necesario intervenir.

Más aun, no puedo obviar que los hechos de este caso recogen una situación muy particular. Un menor fue inscrito en el Registro Demográfico a nombre de una pareja del mismo sexo, aunque se sabía la identidad del padre biológico y este había expresado en todo momento su intención de reconocer y responsabilizarse por la criatura. En lugar de reconocerle como padre biológico, lo ignoraron e inscribieron al menor con el apellido de la madre primero, aunque era previsible que el padre reclamaría la paternidad. Entonces, la madre solicitaría que solo se sustituyera el segundo apellido del menor, para garantizar que este llevara el apellido de la madre en primera instancia, a pesar del uso y costumbre y sin necesidad de ponerse de acuerdo con el padre para lograr esa meta. En otras palabras, el padre solo contó como un proveedor gratuito de esperma y su apellido pasaría a un segundo plano por voluntad exclusiva de la madre y su pareja.

La práctica de dar primacía en la inscripción registral al apellido paterno es centenaria en Puerto Rico y rara vez ha sido cuestionada, como en este caso. Por tratarse de una práctica común (incluso más equitativa que su contraparte en otros lugares del globo en los que se borra el segundo apellido) no puedo considerar seriamente la idea de que es contraria al orden público.

Las fuentes de derecho en Puerto Rico son "la Constitución, la ley, la costumbre y los principios generales del Derecho". Art. 2 del Código Civil, 31 LPRA sec. 5312. "La costumbre solo rige en ausencia de ley aplicable, si no es contraria a la moral o al orden público y si se prueba su espontaneidad, generalidad y constancia". Art. 4 del Código Civil, 31 LPRA sec. 5314.

Reconozco la opinión respetable de algunos comentaristas, que se recogen en los votos particulares disidentes, a los efectos de que la ley no impone un orden determinado para inscribir los apellidos de un menor. Sin embargo, ante la omisión del legislador reconocida por esos mismos comentaristas, en casos como este donde existe controversia entre los progenitores sobre el orden en que se deben inscribir los apellidos, la laguna reglamentaria la suple el uso y costumbre como fuente de Derecho, según se establece en el Art. 2 del Código Civil, supra.

Tampoco ignoro el argumento de que la costumbre de inscribir el apellido del padre en primer orden propicia un discrimen contra la mujer. Si ese fuera el caso, este Tribunal tendría el deber de corregir la situación, "aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder el marco de sus atribuciones". Figueroa Ferrer v. E.L.A., 107 DPR 250, 278 (1978). El problema con la tesis de la parte peticionaria es que la inconstitucionalidad planteada no existe. Escoger

entre dos alternativas, en ausencia de un acuerdo entre las partes, no es discriminar en contra de la Constitución. Es reconocer que el criterio para escoger el orden de los apellidos no es quién llegó primero al Registro Demográfico, a inscribir su apellido como el primero.

Nótese que no estamos ante un reclamo de libertad para acordar el orden de los apellidos. Aquí no hubo acuerdo sino imposición de la madre. Lo que se reclama es que esa imposición -porque ella llegó primero al Registro- es una reacción necesaria ante un discrimen por sexo. Pero esa inconstitucionalidad no existe porque en ausencia de un acuerdo entre los progenitores, el Estado siempre tendrá que escoger cuál de los apellidos constará primero. ¿O es que el padre podría alegar discrimen inconstitucional por sexo si se impone el apellido de la madre como primer apellido, en contra de su deseo? Evidentemente no. Precisamente porque estamos ante reclamos similares entre personas con igualdad de derechos, el Art. II, Sec. 1 de la Constitución de Puerto Rico, 1 LPRA, no resuelve esta controversia.

Los hechos de este caso distan de la situación en que la pareja acuerda invertir el orden de los apellidos. Por el contrario, para "rechazar el patriarcado" se quiso imponer un orden de los apellidos por la única razón de que la madre llegó primero al Registro. Al parecer confundieron el Registro Demográfico con el Registro de la Propiedad.

La propuesta de que el Tribunal establezca como norma que las parejas podrán acordar la alteración del orden de los apellidos tampoco atiende si es deseable o permisible que bajo un mismo techo vivan menores que son hijos de los mismos progenitores, pero tienen apellidos en orden distinto. Mucho menos establece las reglas que el Estado va a seguir cuando los progenitores no lleguen a un acuerdo, algo que se ha legislado en muchos otros lugares[1]. La conveniencia de eso, o las reglas para atenderlo, son asuntos de eminente competencia legislativa. No es un asunto de discrimen constitucional, pues si los progenitores no se ponen de acuerdo (como sucedió aquí), el Estado tendrá que elegir un orden entre los apellidos (o un apellido en las jurisdicciones donde se inscribe uno solamente). En esas instancias, el Estado tendrá que escoger cuál de los dos apellidos irá primero, siguiendo las directrices que el Pueblo ordene mediante legislación.

No se trata de discriminar por prejuicio. Para reglamentar este asunto, en el cual "existen distintos intereses individuales y grupales, y diversas relaciones sociales, es necesario establecer clasificaciones". López v. E.L.A., 165 DPR 280, 297 (2005). Basta que "la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo", Zachry International v.

---

[1] Por ejemplo, véanse en España, el Art. 49 de la Ley Núm. 20 de 21 de julio de 2011 (el criterio será "el interés superior del menor"); en Francia, el Art. 311-21 de su Código Civil (orden alfabético de los apellidos) y en Uruguay, la Ley Núm. 75.075 - 9 mayo 2013 (sorteo).

Tribunal Superior, 104 DPR 267, 277 (1975), como sin duda lo es la inscripción de los apellidos de los nacidos en Puerto Rico. "La desigualdad que infringe la Constitución es aquella que refleja una preferencia basada en prejuicio, no la que descansa en un interés público". Vda. de Miranda v. Srio. de Hacienda, 114 DPR 11, 14 (1983). Véase, además, Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 71 (2010), cert. denegado Castro v. Puerto Rico, 131 S.Ct. 152 (2010).

Establecer por opinión judicial un catálogo de directrices administrativas para inscribir el orden de los apellidos en ausencia de un acuerdo de los progenitores sería sobrepasar nuestras funciones e invadir las legislativas. Peor es reconocer como norma la primacía de la "carrera al Registro", como sucedió en este caso. Incluso, la propuesta de evaluar el mejor interés del menor fomentaría la presentación de más pleitos judiciales pues los funcionarios del Registro Demográfico no tienen autoridad para eso. En ese sentido, mientras no haya legislación al respecto, el uso y costumbre es el único criterio certero para que los oficiales del Registro Demográfico puedan anotar el orden de los apellidos, en ausencia de un acuerdo entre los progenitores.

En fin, para alterar el uso y costumbre hay que legislar. Por definición, no podemos atender este asunto satisfactoriamente desde el estrado judicial, a espaldas de la preferencia de nuestro Pueblo, estatuida por sus

representantes electos.[2] Como señaló el Hon. Adames Soto, Juez, en su Voto de Conformidad en este caso desde el Tribunal de Apelaciones, "las creencias particulares del juez tienen que ceder ante el respeto que merece la rama de gobierno a la cual corresponde legislar". Apéndice del *Certiorari*, pág. 186. Fiel a ese principio, mi voto es para denegar la expedición del auto de *certiorari*.


                                    RAFAEL L. MARTÍNEZ TORRES
                                         Juez Asociado

---

[2] Hasta el presente, la Asamblea Legislativa de Puerto Rico no ha legislado sobre este tema, aunque se han presentado proyectos para atenderlo. Por ejemplo, el Tribunal de Apelaciones destacó el P. del S. 611, aprobado por el Senado el 7 de junio de 2022. Irónicamente, si esa medida fuera la ley vigente, procedería inscribir al menor con el apellido del padre, porque los apellidos se inscribirían en orden alfabético si los progenitores no se ponen de acuerdo.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Anthony Cintrón Román<br><br>     Recurrido<br><br>          v.<br><br>Charline Michelle Jiménez Echevarría, por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth Noelia Rodríguez Ocasio, por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>     Peticionaria | CC-2023-0049 | |

Voto particular de conformidad emitido por la Jueza Asociada Señora Pabón Charneco al cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón.

En San Juan, Puerto Rico, a 2 de mayo de 2023.

Hoy nos enfrentamos a una disputa sobre el orden en el que deben registrarse los apellidos de un menor cuando sus progenitores no logran alcanzar un acuerdo. A pesar de que los progenitores o adoptantes son quienes en paridad y concierto deben tomar las decisiones sobre su progenie en función de sus derechos y obligaciones, es deber del Estado velar por el interés óptimo del menor ante la demora o falta de acuerdo entre estos.

La controversia que hoy nos atañe tiene importantes implicaciones sobre los menores. Son estos quienes serán identificados e individualizados en su entorno social y jurídico por su nombre. Por ello, esta controversia debe ser atendida de forma responsable, reconociendo una nueva realidad jurídica que descarta desigualdades históricas, pero siempre centrada en el interés óptimo del menor y su desarrollo pleno. **Rechazo que las niñas y los niños de Puerto Rico se conviertan en punta de lanza de otras batallas al aceptar una lectura adultocéntrica de esta controversia, y por consiguiente, su bienestar no sea lo central del análisis que hoy nos compete.**

La Asamblea Legislativa es el cuerpo que debe atenderla y proveer criterios claros a los progenitores y tribunales que propicien una resolución rápida de la identificación del menor. Para esto, cuenta con el ejemplo de numerosos países que han abolido la tradición patriarcal del dominio del apellido paterno, que han reconocido la capacidad de los progenitores de escoger el orden de los apellidos y que han ofrecido a sus ciudadanos normas claras y objetivas en caso de falta de acuerdo.

Las opciones para atender situaciones como las del caso de autos son variadas (uso del sorteo, el orden alfabético, entre otras), pero principalmente requieren un elemento de aleatoriedad. Sin embargo, ante el conflicto entre dos progenitores con iguales derechos y en lo que la Asamblea

Legislativa provee otras guías, recae en los tribunales determinar el orden de los apellidos atendiendo el interés óptimo del menor y en caso de que no existan razones para escoger un orden u otro, utilizar un método objetivo o aleatorio para ese propósito.

Toda vez que nuestro voto se da en cuanto al resultado y no los fundamentos, confirmaría el dictamen recurrido. Considero que el orden alfabético es un mecanismo objetivo apropiado para atender la controversia de autos, máxime cuando recientemente ha sido aprobado por el Senado de Puerto Rico y actualmente está siendo examinado por la Cámara de Representantes.

## I

El 8 junio de 2021, el Sr. Anthony Cintrón Román (señor Cintrón Román, progenitor o padre) presentó una *Demanda* sobre impugnación de maternidad y filiación en contra de la Sra. Charline Michelle Jiménez Echevarría (señora Jiménez Echevarría, progenitora o madre), por sí y en representación del menor MMRJR, la Sra. Ruth Noelia Rodríguez Ocasio (señora Rodríguez Ocasio o cónyuge) y la Sociedad Legal de Gananciales compuesta por ambas (matrimonio Jiménez Rodríguez).

El señor Cintrón Román indicó que sostuvo una relación de pareja con la señora Jiménez Echevarría por varios años. Posteriormente, la señora Jiménez Echevarría y la señora Rodríguez Ocasio contrajeron nupcias. Adujo que el menor

MMRJR es fruto de su relación con la señora Jiménez Echevarría mientras estaba casada con la señora Rodríguez Ocasio. Sostuvo que durante el embarazo y tras el parto le expresó reiteradamente a la progenitora su interés de ejercer la paternidad y reconocer al menor por lo que también aportó para sus necesidades en espera del nacimiento. Sin embargo, indicó que el matrimonio Jiménez Rodríguez acudió al Registro Demográfico sin informarle e inscribió al menor como hijo de ambas. Por lo tanto, a días del nacimiento impugnó la maternidad de la señora Rodríguez Ocasio y sostuvo ser el padre biológico. Además, solicitó ser filiado con el menor y que se ordenara la corrección correspondiente en el Registro Demográfico. Luego de varios trámites procesales, el matrimonio Jiménez Rodríguez se allanó a la impugnación de presunción de maternidad y solicitó que se mantuviera "Jiménez" como el primer apellido del menor.

Mediante Sentencia de 26 de mayo de 2022, el Tribunal de Primera Instancia declaró Ha Lugar la impugnación de presunción de maternidad y la filiación solicitada, reconociendo al señor Cintrón Román como padre del menor. Asimismo, el foro de instancia concluyó que procedía la "sustitución" de apellidos por lo que ordenó al Registro Demográfico mantener a la madre en la primera entrada y al padre en la segunda entrada, de forma tal que el nombre del

menor incluya primero el apellido materno y luego el paterno.[1]

El señor Cintrón Román solicitó reconsideración en cuanto al orden de los apellidos por entender que "[l]a decisión no está sustentada por algún precepto legal que defina que el orden de los apellidos va a ser el método de sustitución de los apellidos". Apéndice del *Certiorari*, pág. 37. En vista de que la misma fue denegada, recurrió ante el Tribunal de Apelaciones solicitando que se resolviera conforme al uso y la costumbre. Sostuvo que el impedir que el apellido del padre esté en primer lugar en la inscripción de la filiación era parte de un intento de las demandadas para invisibilizarlo.

El foro apelativo intermedio concluyó que ante el desacuerdo de los progenitores, imperaba la norma consuetudinaria de que la persona natural sería inscrita con el apellido paterno en primer orden y el apellido materno en segundo orden. Añadió que igual resultado se obtendría de recurrir al orden alfabético de los apellidos de los progenitores como fuera propuesto en su momento por la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil.

Inconforme, la señora Jiménez Echevarría acude ante nos e indica que como el menor fue inscrito previo al procedimiento de impugnación de maternidad, la controversia

---

[1] Apéndice del *Certiorari*, pág. 101.

se limita a la "sustitución" de los apellidos y no a la alteración del orden de los mismos. Por lo tanto, aplicaría el Art. 84 del Código Civil, 31 LPRA sec. 5543, y el Art. 19-A de la Ley Núm. 24 de 22 de abril de 1931, según enmendada, conocida como Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1133a. Además, sostiene que la aplicación del uso y la costumbre a situaciones como esta conlleva la violación de diversas protecciones constitucionales y el uso de criterios que han servido para oprimir a las mujeres en sus relaciones familiares.

Evaluados los argumentos presentados por las partes, este Tribunal dictó resolución denegando la expedición del auto.

**II**

A. **La identidad, el derecho al nombre y el vínculo filiatorio**

El nombre identifica e individualiza a la persona en el entorno social y jurídico.[2] En vista de esto, nuestro ordenamiento reconoce el derecho de toda persona natural a tener, reclamar y proteger su nombre, el cual se debe

---

[2] M. Fraticelli Torres, *La persona natural y las instituciones familiares en el Derecho Puertorriqueño: una mirada axiológica a los libros primero y segundo del nuevo Código Civil de Puerto Rico*, en L. Muñiz Argüelles y otros, *El Código Civil de Puerto Rico de 2020: primeras impresiones*, San Juan, Fideicomiso Escuela de Derecho Universidad de Puerto Rico, 2021, pág. 68; E. Torrelles Torrea, *La elección del orden de los apellidos por parte de los progenitores y los criterios de determinación a falta de acuerdo en la Ley de Registro civil de 2011*, 92 (Núms. 753-754) Revista Crítica de Derecho Inmobiliario 185, 187 (2016); M. Linacero de la Fuente, El nombre y los apellidos, Editorial Tecnos, S.A., 1992, págs. 19 y 20; C.E. Mascareñas, *El nombre de las personas*, 3 Rev. Der. PR 395 (1963).

inscribir en el Registro Demográfico.[3] Arts. 82, 558 y 561 del Código Civil, 31 LPRA secs. 5541, 7104 y 7111. El nombre comprende el propio o individual unido al primer apellido de los progenitores o adoptantes. Arts. 83 y 588 del Código Civil, supra, 31 LPRA secs. 5542 y 7104.

Específicamente en cuanto a los apellidos, estos se han relacionado directamente con la filiación, pues suelen identificar y exteriorizar el vínculo filiatorio. Es decir, la relación jurídica que vincula a las personas con sus padres y madres, y que origina importantes derechos y obligaciones.[4] *Rivera Marrero v. Santiago Martínez*, 203 DPR 462, 475-476 (2019). Uno de estos derechos es tener los apellidos de los progenitores o adoptantes. *Sánchez v. Sánchez*, 154 DPR 645, 661 (2001). Por lo tanto, como norma general, la filiación natural o la adoptiva determina los apellidos de la persona natural. Arts. 557 y 558 del Código Civil, 31 LPRA secs. 7103 y 7104. Además del aspecto de identidad como miembro de una familia, el requerimiento de la inscripción de dos apellidos, paterno y materno en cuanto aplique, tiene el objetivo dual de garantizar la "más efectiva individualización de la persona en una sociedad muy

---

[3] Véanse además, Art. 6 de la Ley Núm. 289-2000, conocida como Declaración de Derechos y Deberes de la Persona Menor de Edad, su Padre, Madre o Tutor y del Estado, 1 LPRA sec. 425; Art. 2 de la Ley Núm. 338-1998, conocida como Carta de los Derechos del Niño, 1 LPRA sec. 412(2).

[4] "La filiación tiene lugar por vínculo genético, por métodos de procreación asistida o por adopción". Art. 556 del Código Civil, 31 LPRA sec. 7102.

poblada, y reconoce[r] a la mujer y al hombre paridad de derechos respecto a los hijos e hijas que procrean juntos".[5]

B. **El orden de los apellidos y la igualdad entre progenitores**

A diferencia de otras jurisdicciones, ni el Código Civil o las leyes especiales de Puerto Rico establecen el orden en que deben inscribirse ambos apellidos.[6] Como expresáramos, el Código Civil solamente indica que el nombre de una persona incluye el primer apellido de sus progenitores. Ante una sola filiación reconocida, esto no es posible. En tales casos, el Art. 84 del Código Civil, *supra*, ordena que el menor sea inscrito con los dos apellidos del progenitor que lo reconoce. Sin embargo, de ocurrir un reconocimiento posterior, se **sustituirá** uno de los apellidos por el del que lo reconoce.[7] Podemos observar que esta disposición no

---

[5] Código Civil 2020 Comentado, pág. 76, https://8b1bf758-1982-44d6-af7c-944f8408e8fa.filesusr.com/ugd/5be21a_15cd7772b7ca4ecd84035ed394e1e517.pdf. Véanse además, E. Torrelles Torrea, pág. 187; C.E. Mascareñas, *supra*.

[6] El Código Civil refiere a la legislación especial, Ley Núm. 24 de 22 de abril de 1931, según enmendada, conocida como Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1041 et seq., para la inscripción, alteración o modificación del nombre. Arts. 85 y 694 del Código Civil, 31 LPRA sec. 5544 y 7655. Véase además, Código Civil 2020 Comentado, pág. 78.

[7] "El reconocimiento posterior del otro progenitor justifica la sustitución de uno de los apellidos en el nombre de la persona por el del progenitor que le reconoce con posterioridad". Art. 84 del Código Civil, 31 LPRA sec. 5543. Así, el Art. 19-A de la Ley Núm. 24, *supra*, atiende el reconocimiento e inscripción por un solo progenitor conforme lo dispuesto en el Art. 84 del Código Civil, *supra*. El Art. 31 de la Ley Núm. 24, supra, atiende el proceso de corrección de errores y establece el proceso para el cambio de nombre a solicitud de parte interesada. Explica C.E. Mascareñas, supra, pág. 408, sobre el manejo en el registro de estos casos que, "[s]i [el menor] estaba reconocido por la madre, al ser reconocido por el padre adquirirá como primer apellido el paterno y, en consecuencia, perderá, en tanto que primer apellido, el de la madre. Si estaba reconocido por el padre, al ser reconocido, después, por la madre se alterará el nombre completo al adquirir como segundo apellido el de la madre".

especifica "cómo o dónde se colocará el apellido añadido en la nueva inscripción, lo que implica que puede sustituirse y colocarse en cualquier orden".[8]

Por otro lado, el Art. 578 del Código Civil, 31 LPRA sec. 7132, requiere que tras **rebatirse la presunción de paternidad o maternidad** o luego de anulado el reconocimiento voluntario, el tribunal ordene **la corrección** de los datos inscritos en el certificado de nacimiento.

A pesar de la omisión que consideramos, el registro prioritario del apellido paterno ha prevalecido debido a la costumbre y los usos sociales.[9] Ciertamente, la costumbre, como práctica repetida de una conducta, rige en ausencia de ley aplicable si no es contraria a la moral o al orden público y se prueba su espontaneidad, generalidad y constancia.[10] Art. 4 del Código Civil, 31 LPRA sec. 5314. Empero, solamente puede utilizarse de no haber leyes aplicables. *PRHOA v. Confederación Hípica*, 202 DPR 509 (2019). Este no es el caso. Todo lo contrario, el Código Civil provee disposiciones que guían nuestra interpretación sobre este asunto de forma que podamos resolver de acuerdo

---

[8] M. Fraticelli Torres, *op.cit.*, pág. 67.

[9] E. Torrelles Torrea, *supra, pág.* 187; B.D. Rivera Burgos, *El orden de los apellidos en Puerto Rico*, 67 (Núm. 2) Rev. Col. Abog. PR. 29, 43 (2006). Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico, 22 de agosto de 1995.

[10] Código Civil 2020 Comentado, pág. 25.

al verdadero sentido de la ley y conforme a nuestro deber inexcusable de resolver diligentemente los asuntos ante nuestra consideración. Art. 6 del Código Civil, 31 LPRA sec. 5316. Ese cuerpo normativo reconoce la igualdad entre progenitores, así como, el ejercicio conjunto de la patria potestad. Arts. 593 y 609 del Código Civil, 31 LPRA Sec. 7302. Todo ello enmarcado en la política pública de proteger el bienestar óptimo del menor. Por lo tanto, a la luz de estas disposiciones y principios reconocidos en el Código Civil y que prevalecen sobre el uso y la costumbre, los progenitores pueden escoger el orden de los apellidos con el que inscribirán a su prole.[11] *Roig Pou y otros v. Reg. Demográfico*, 203 DPR 346 (2019).

Utilizando estos mismos fundamentos debemos examinar cómo se determina el orden de los apellidos cuando no hay consenso. Para nuestro beneficio, numerosas jurisdicciones ya han atendido este dilema. En primer lugar, han reconocido mediante legislación que los progenitores acuerden el orden de los apellidos. También han atendido de formas diversas

---

[11] Hemos reconocido que, de forma concertada, los progenitores tienen la capacidad para solicitar la corrección y cambios de nombres y apellidos de los menores al amparo del Art. 31 de la Ley Núm. 24 de 22 de abril de 1931. 24 LPRA sec. 1231, según enmendada, conocida como Ley del Registro Demográfico de Puerto Rico. *Roig Pou v. Registro Demográfico de Puerto Rico*, 203 DPR 346 (2019). Así, en *Roig Pou v. Registro Demográfico de Puerto Rico*, 203 DPR 346 (2019), no encontramos impedimento legal para que los progenitores solicitaran modificar los apellidos de un menor inscrito. Véase además, M. Fraticelli Torres, *op.cit.*, págs. 66, 67.

aquellas situaciones en las que los progenitores no logran consenso.

En los países civilistas que comparten la práctica de inscribir a las personas con el apellido materno y paterno, ha predominado el uso del sorteo, por ejemplo, Argentina, Chile y Colombia.[12] Sin embargo, también se ha considerado el orden alfabético.[13] En algunas jurisdicciones lo decide el encargado del Registro, en otras un magistrado. Por otro lado, el ordenamiento jurídico español remite al interés superior del menor.

## III

En el caso ante nos, el menor fue inscrito con el apellido de la madre y de su cónyuge, quien no tiene vínculo genético ni adoptivo con este. Posteriormente, el padre impugnó la maternidad de la cónyuge para establecer la filiación natural con el menor por vínculo genético. De igual forma, requirió las correcciones correspondientes en el Registro Demográfico. Por lo tanto, al establecerse este vínculo y negarse la filiación ya establecida, correspondía al Tribunal ordenar la corrección de los datos inscritos en el certificado de nacimiento del menor a tenor con el Art.

---

[12] Biblioteca del Congreso Nacional de Chile, Ley Núm. 21334 sobre la determinación del orden de los apellidos por acuerdo de los padres, https://www.bcn.cl/leychile/navegar?idNorma=1159523; Congreso de Colombia, Ley 2129 de 4 de agosto de 2021 por medio de la cual se deroga la Ley 54 de 1989 y se establecen nuevas reglas para determinar el orden de los apellidos, https://www.funcionpublica.gov.co/eva/gestornormativo/norma.php?i=167986.

[13] Fla. Stat. sec. 382.013 (2022). Véase, B.D. Rivera Burgos, *supra*.

578 del Código Civil, supra. No obstante, ambos progenitores (madre y padre) no logran consensuar en cuanto al orden de los apellidos.

Por un lado, el padre sostiene que ante la falta de una disposición específica, el apellido paterno debe estar en primer orden como ha sido el uso y costumbre, fuente de derecho reconocida por el ordenamiento jurídico. Su postura no nos convence. Como discutiéramos previamente, el Código Civil reconoce la paridad de derechos de la madre y el padre respecto a sus hijos e hijas y restringe el uso injustificado de criterios que discriminen o limiten sus facultades y deberes. Por lo tanto, la costumbre de priorizar el apellido paterno sobre el materno, aunque práctica constante y generalizada hasta la promulgación del Código Civil vigente, no puede prevalecer sobre la igualdad de los progenitores en el estado jurídico y social actual.

Por otro lado, la madre sostiene que como el apellido materno constaba en primer orden solamente corresponde sustituir el apellido de su cónyuge e inscribir el apellido paterno en su lugar. Para sustentar este argumento se apoya en el Art. 84 del Código Civil, *supra*, que autoriza la sustitución del apellido en el supuesto de la inscripción original por un solo progenitor. No obstante, esta disposición no atiende la controversia. Tampoco propende a la paridad de derechos entre progenitores y menos aún al bienestar óptimo del menor. Por lo tanto, los tribunales al

considerar la posible modificación de los apellidos de un menor que había sido previamente inscrito por uno de los progenitores, y no existiendo acuerdo entre estos, no debe avalar la primacía de un apellido sobre otro porque fuera inscrito primero, sino que debe examinar tal modificación a la luz del interés óptimo del menor. Así, por ejemplo, pudiera atentar contra el interés de un adolescente sustituir el apellido de primer orden (con el que se ha identificado por años) para en su lugar incluir otro apellido por una nueva filiación. También el tribunal pudiera determinar que el interés óptimo del menor en tal caso es que el apellido hasta entonces en segundo orden, advenga el primero. En otros casos, el interés óptimo del menor pudiera ser mantener los apellidos del progenitor que lo había inscrito y no incorporar otros. Esta última situación es considerada en el Código Civil especialmente para los casos de adopción.[14]

Recordemos que el apellido, por sí mismo, no es necesario para que se establezca la filiación. Obsérvese el

---

[14] "Los apellidos sirven para identificar el nexo jurídico o el parentesco existente entre los progenitores y su descendencia. Ello no implica que la persona natural no pueda modificar el nombre y los apellidos con que aparece inscrita, si lo justifica debidamente, porque la modificación así lograda no altera el estado filiatorio establecido jurídicamente. Tampoco excluye la posibilidad de que el adoptado, porque conviene a su interés óptimo, retenga el apellido de su familia biológica". Código Civil 2020 Comentado, pág. 510. Además, "[E]n armonía con la regulación que adopta este Código respecto al orden de los apellidos, se atenderá a lo que dispongan los padres adoptantes sobre el modo en que aparecerán los nuevos apellidos en el certificado de inscripción. El tribunal proveerá un tratamiento distinto si la alteración del nombre o el modo en que se inscribirá o añadirá un solo apellido, por tratarse de una adopción individual, no es conveniente al interés óptimo del adoptado". Id., pág. 565.

ejemplo de España, jurisdicción que ha reconocido como interés óptimo del menor el que los apellidos no sean modificados cuando (1) la filiación fue determinada judicialmente contra la oposición del progenitor o (2) del el menor haber sido concebido debido a una agresión sexual contra la madre y el progenitor fuera condenado mediante sentencia penal firme.[15] Sin embargo, la persona puede tomar la decisión de modificar sus apellidos una vez advenga a la mayoría de edad.

Por lo tanto, existiendo falta de acuerdo entre los progenitores respecto al orden de los apellidos y reconociendo la paridad entre estos, corresponde al tribunal decidir conforme al interés óptimo del menor. Ante la diversidad familiar que reconoce nuestro ordenamiento, controversias como estas deben ser atendidas de forma responsable y objetiva, a la luz de una nueva realidad jurídica, y no simplemente ignorada bajo la conveniencia de la costumbre. Tampoco debería ser abandonada a una posible competencia sobre quién inscribe primero al menor y que tenga, por consiguiente, el efecto de suprimir la toma de decisiones conjuntas. No podemos utilizar a los menores como punta de lanza para otras batallas. Esto, pues hay que:

> analizar el fenómeno de la identidad personal con una mayor detención, en consideración a la parcialidad que genera ese deseo irrefrenable de proteger y tutelar a la infancia únicamente a partir de una **lectura adultocéntrica**, en la que el

---

[15] Art. 111.2 del Código Civil español.

derecho establece límites de acceso a ciertas capacidades en función de la edad, pero también gracias a la cual se reproducen imaginarios sobre lo adulto y sobre la satisfacción de los intereses de los progenitores como lo valioso y central. Esto es especialmente importante en relación con la identidad, pues es claro que, no obstante sus características, en su determinación juegan un rol preponderante los progenitores, por lo que es esencial que se tenga especialmente en cuenta sus efectos en el interés […] de niñas, niños y adolescentes.[16]

En el caso de autos, ni el padre ni la madre han cuestionado que el mejor interés del menor se afecte por la selección de uno u otro apellido. Sus argumentos se han centrado en sus derechos como progenitores. Recordemos que las hijas y los hijos no son nuestra propiedad ni los etiquetamos con nuestros apellidos. Como progenitores estamos obligados a tomar decisiones en su beneficio. Por lo tanto, no habiendo mayor preocupación al respecto, concuerdo con que "'hay que asumir que si se quiere una auténtica igualdad entre los apellidos del padre y de la madre, puesto que en la mayoría de los casos no existirán razones que puedan aconsejar un orden u otro, la solución que se adopte necesariamente debe tener un componente de aleatoriedad'".[17] La norma que finalmente rija debe también

---

[16] R. Álvarez y N. Rueda, *Derecho a la identidad, filiación y apellidos. Perspectiva desde los derechos de la infancia y de la mujer en los sistemas jurídicos chileno y colombiano*, 28 (Núm. 2) Ius et ( 2022), https://www.scielo.cl/scielo.php?pid=S071800122022000200124&script=sci_arttext.
[17] E. Torrelles Torrea, supra, pág. 200, citando a M. Navarro Castro, *Comentario al artículo 49 LRC 2011*, en J.A. Cobacho Gómez y A. Liceñena Ibarra, *Comentarios a la Ley de Registro Civil*, Thomson Routers Aranzadi, Cizur Menor.

considerar y adaptarse a otras composiciones familiares. ¿Qué norma seguiríamos si la falta de acuerdo es entre dos padres?

Toda vez que nuestra revisión se da en cuanto al resultado y no los fundamentos del dictamen recurrido, considero que el orden alfabético es apropiado para atender la controversia de autos. Esto, pues es un mecanismo objetivo que no solo está siendo considerado actualmente por la Asamblea Legislativa, sino que ya ha sido aprobado por el Senado y en estos momentos espera por el estudio de la Cámara de Representantes.[18] Por lo tanto, siendo el apellido materno Jiménez y el apellido paterno Cintrón, es adecuado que el menor sea inscrito con los apellidos en el orden Cintrón Jiménez.[19] Ya de adulto, el ahora menor, podrá decidir si mantiene este orden o lo modifica. Finalmente, reiteramos nuestra exhortación a la Asamblea Legislativa a proveer pautas claras que atiendan las diversas situaciones que puedan surgir y que están fuera de nuestro examen de este caso.

---

[18] P. de la S. 611 de 7 de junio de 2022, 3ra Sesión Ordinaria, 19na. Asamblea Legislativa. El 7 de junio de 2022 se efectuó la votación en el Senado de Puerto Rico con un resultado de veinte (20) a favor, cuatro (4) en contra y tres (3) ausentes.

[19] Esto no atiende otros argumentos que pudieran tener mucha validez en la selección de uno u otro mecanismo. Así, por ejemplo, los progenitores de apellido Vázquez, Zayas y Zequeira de Puerto Rico o aquellos cuyos apellidos puedan desaparecer de no transmitirse a una nueva generación, podrían no estar conformes con esta interpretación.

**IV**

Por los fundamentos antes expresados, confirmaría la Sentencia del Tribunal de Apelaciones que ordenó que el menor sea inscrito con los apellidos en el orden Cintrón Jiménez.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Anthony Cintrón Román<br><br>     Recurrido<br><br>       v.<br><br>Charline Michelle Jiménez Echevarría por si y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuestas, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>     Peticionarias | CC-2023-0049 |  |

La Jueza Presidenta Oronoz Rodríguez emitió un Voto Particular Disidente.

En San Juan, Puerto Rico, a 2 de mayo de 2023.

> "In these times of parental equality, arguing that the child … should bear the paternal surname based on custom is another way of arguing that it is permissible to discriminate because the discrimination has endured for many years". <u>Bobo v. Jewell</u>, infra, pág. 334.

I

Vivimos en un mundo plagado de manifestaciones de inequidad y trato desigual basadas en género, algunas solapadas y otras patentemente visibles. Esas mismas manifestaciones o visión androcéntrica han determinado por siglos las normas jurídicas y sociales que rigen en nuestro ordenamiento, incluyendo la que determina el orden de los apellidos de una criatura.

Privilegiar el apellido paterno sobre el materno persigue mantener nociones y prácticas discriminatorias en contra de la mujer. El criterio diferenciador que se ha utilizado históricamente para mantener la imposición del apellido paterno está basado exclusivamente en el sexo de los integrantes de la pareja, lo cual es violatorio del principio de igualdad y no discriminación consagrado en nuestra Constitución. Por tal razón, resulta inaudito que un Tribunal de Apelaciones -teniendo otras opciones no discriminatorias— recurra a aplicar el uso y costumbre como fuente de Derecho para suplir un vacío legislativo elevando como norma una práctica claramente vedada por nuestra Carta de Derechos, en particular el principio de la inviolabilidad de la dignidad humana, el principio de no discriminación y el derecho a la igual protección de las leyes. Este Tribunal, como máximo intérprete de nuestra Constitución y las leyes, no debió claudicar su función y debió pautar y corregir los errores patentes del tribunal intermedio. Por eso, disiento del curso tomado en este caso, aunque aún albergo la esperanza de que el proceder del Tribunal de Apelaciones será descartado en el futuro por no ser precedente para casos similares.

II

En el caso ante nos se generó una controversia en un pleito de filiación. Habiendo el padre biológico prevalecido en su petición de figurar en el Registro Demográfico como padre biológico del menor, exigió que su apellido precediera

el de la madre biológica. Los progenitores no se pusieron de acuerdo en el orden por lo que el Tribunal de Primera Instancia, en un ejercicio razonable de interpretación, resolvió el asunto, y ordenó que se mantuviese el apellido materno en primer lugar y en segundo orden el del padre. Inconforme, el padre biológico presentó un recurso de apelación ante el Tribunal de Apelaciones, que emitió una Sentencia en la que revocó la determinación del Tribunal de Primera Instancia.[1] En lo pertinente, concluyó que, al no haber acuerdo entre las partes, y al no existir una ley que regulase el orden de los apellidos en el certificado de nacimiento de un menor, procedía aplicar el Art. 4 del Código Civil. 31 LPRA sec. 5314. Consecuentemente, el Tribunal de Apelaciones razonó que la costumbre en Puerto Rico dicta que el apellido paterno debe constar en primer lugar. Adicionó que, si bien reconocía que dicha costumbre se hilvanó dentro de unos preceptos de una sociedad patriarcal, razonó que esta no es contraria a la moral ni al orden público. Insatisfechos con el proceder del Tribunal de Apelaciones,

---

[1] La Jueza Mateu Meléndez disintió por entender que el derecho vigente no prohíbe que una persona inscrita tenga como primer apellido el materno. Arguyó que, ante la inexistencia de una prohibición como esa, no se justifica recurrir al uso y costumbre como fuente de derecho para alterar el orden de los apellidos del menor. La Jueza Mateu Meléndez comparó la controversia ante nos con la situación que se da cuando solamente uno de los progenitores reconoce a un menor. En ese caso, se puede inscribir a un menor con ambos apellidos de ese progenitor. Sin embargo, el Art. 84 del Código Civil establece que "el reconocimiento posterior del otro progenitor justifica la sustitución de uno de los apellidos en el nombre de la persona por el del progenitor que le reconoce con posterioridad". 31 LPRA sec. 5543. Nótese que el referido artículo no establece que el apellido del padre tiene que ir en primer lugar, sino que deja abierto a que el apellido del progenitor que reconoció al menor posteriormente sustituya "uno de los apellidos".

las peticionarias presentaron un recurso de *certiorari* ante nos y cuestionaron la corrección de recurrir a la costumbre como fuente de derecho para imponer una norma que dicta que, en caso de desacuerdo entre los progenitores, el apellido paterno siempre se debe inscribir en el primer lugar y el materno segundo. Este Tribunal declinó expedir el recurso de *certiorari*.

Por entender que las peticionarias tienen la razón y el Tribunal de Apelaciones cometió los errores señalados, me veo obligada a disentir del curso de acción de no expedir este recurso para revocar al Tribunal de Apelaciones.

### i. Código Civil de 2020

En primer lugar, el Art. 82 del Código Civil de 2020 establece que toda persona natural tiene el derecho a tener y a proteger su nombre, que debe inscribirse en el Registro Demográfico de conformidad con la ley, y que no se inscribirán nombres ofensivos a la dignidad de la persona. 31 LPRA sec. 5531. El Art. 83 detalla cuál será el contenido del nombre de una persona: el nombre propio o individual unido al primer apellido de sus progenitores. 31 LPRA sec. 5542.

Por otro lado, el Art. 557 del Código Civil establece que la filiación natural o la adoptiva determinarán los apellidos de una persona natural. 31 LPRA sec. 7103. Además, en el Art. 558 se indica que un hijo o hija tiene derecho a llevar el apellido de cada progenitor, pero no establece en qué orden. 31 LPRA sec. 7104.

El Art. 84 regula lo concerniente al reconocimiento posterior del otro progenitor tras el reconocimiento e inscripción de la persona nacida por uno de los progenitores. El referido artículo permite la sustitución de uno de los apellidos en el nombre del hijo o hija por el del progenitor que le reconoce con posterioridad. 31 LPRA sec. 5543.

Como podemos ver, y como señaló el Tribunal de Apelaciones en su Sentencia, el Código Civil guarda silencio total sobre el orden en el cual se deben inscribir los dos apellidos de una persona natural. Consecuentemente, no ordena que el apellido paterno vaya en el primer lugar ni prohíbe el que el apellido materno ocupe ese sitial.

De otro lado, la Exposición de Motivos del Código Civil del 2020, el cual trajo cambios significativos al Libro de Familia en particular, expresamente arroja luz a los valores y principios que la Asamblea Legislativa se propuso concretizar al modernizar nuestro Código Civil.

En primer lugar, la Asamblea Legislativa indicó que el Código Civil derogado sufrió innumerables enmiendas a través de los años, **con la intención de actualizar sus disposiciones decimonónicas, en aras de atemperar el Código a los cambios y a las realidades actuales de Puerto Rico.** Esto así, porque nuestro Código Civil, más allá de ser una reglamentación o una serie de normas, es un reflejo de las características que nos constituyen como sociedad y de los valores que en común estimamos y aceptamos como

fundamentales en el transcurso de nuestras vidas en comunidad. Exposición de Motivos de la Ley Núm. 55-2020 (2020 [Parte 1] Leyes de Puerto Rico 593, 594). Además, la Asamblea Legislativa reiteró que la realidad social y jurídica de Puerto Rico, así como las relaciones familiares, personales, sociales y económicas en el año 1930, eran muy distintas a las de hoy.

Podemos colegir, pues, que un principio rector que motivó la redacción de un nuevo Código Civil fue codificar los grandes cambios que han ocurrido en los valores predominantes de nuestra sociedad, incluyendo el reconocimiento de la igualdad del hombre y la mujer ante la ley y en su rol como miembros del núcleo familiar.

### ii. Ley del Registro Demográfico

La otra fuente de Derecho a la que podemos recurrir en este caso es la Ley del Registro Demográfico, 24 LPRA sec. 1041 et seq. El Artículo 19 de este estatuto dispone sobre la información requerida en los certificados de nacimiento, sin precisar un orden -paterno o materno- de los apellidos:

> El certificado de nacimiento, que mantendrá en sus archivos el Registrador Demográfico, contendrá la información siguiente, que por la presente se declara necesaria para los propósitos legales, sociales y sanitarios que se persiguen al inscribir el nacimiento:
> ...
> (3) Nombre y apellidos del niño [o niña]. Si el niño [o niña] no ha recibido aún nombre al tiempo de hacerse la inscripción, el declarante de su nacimiento manifestará cuál se le ha de poner,

pero el encargado del registro no inscribirá nombres extravagantes o de animales o en forma alguna impropios de personas, ni admitirá que se conviertan en nombres los apellidos conocidos como tales.

...

(9) Nombre y apellidos propios del padre [o padres].

...

(15) Nombre y apellidos propios de la madre [o madres].

24 LPRA sec. 1133.

Por su parte, el Art. 31 describe de manera detallada el procedimiento a seguir cuando se solicita hacer un cambio en una de las constancias del registro. Sin embargo, nuevamente encontramos que el referido artículo no dispone nada sobre el orden en el cual deben estar los apellidos o si los tribunales están obligados por ley a autorizar una inversión en el orden de estos cuando el apellido materno se inscribió primero. 24 LPRA sec. 1231.

**A. La costumbre como fuente de derecho cuando es contraria a derechos fundamentales**

En su Sentencia, el Tribunal de Apelaciones argumentó que la ausencia de una ley que prohíba que el apellido materno esté en primer orden, no es causa suficiente para permitirlo. Así pues, razonó que ante el desacuerdo de los progenitores sobre la inscripción del orden de los apellidos del menor MMR, impera en nuestro sistema de derecho la norma consuetudinaria de que la persona natural será inscrita con el apellido paterno en primer orden y el apellido materno

en segundo orden.[2] Esto así, a pesar de estar consciente de que tal costumbre se hilvanó dentro de unos preceptos de una sociedad patriarcal. Como examinaremos, ni la normativa estatal ni la federal permiten que una costumbre inherentemente discriminatoria se eleve a fuente de derecho.

El Art. 2 del Código Civil define cuáles son las fuentes de derecho en nuestro ordenamiento jurídico: la Constitución, la ley, la costumbre y los principios generales del Derecho. La jurisprudencia complementa el ordenamiento jurídico con la doctrina que establezca el Tribunal Supremo al interpretar y aplicar la Constitución, la ley, la costumbre y los principios generales del Derecho. 31 LPRA sec. 5312. El Art. 4, por su parte, establece que **la costumbre solo rige en ausencia de ley aplicable, si no es contraria a la moral o al orden público** y si se prueba su espontaneidad, generalidad y constancia. 31 LPRA sec. 5314. Finalmente, a falta de costumbre aplicable, el Art. 5 dicta que se recurrirá a los principios generales del Derecho como fuente del ordenamiento jurídico. 31 LPRA sec. 5315.

Como se puede apreciar de una lectura mesurada del artículo 4 del Código Civil, para recurrir a la costumbre como fuente de Derecho, es necesario que: 1) no exista ley

---

[2] Para ilustrar la improcedencia de la utilización de la costumbre como fundamento para disponer de la controversia, véase: M. Atienza, <u>Un caso no tan difícil</u>, XXIII Rev. Acad. PR Juris. & Legis. 97, 100 (2023) ("Se trata de que aquí estamos ante una situación que no puede haber sido regulada por ninguna costumbre, debido a su carácter estrictamente novedoso").

aplicable; 2) la costumbre no sea contraria a la moral o al orden público; y 3) la costumbre sea espontánea, general y constante. 31 LPRA sec. 5314.

Sobre el primer criterio, valga resaltar que la Constitución del Estado Libre Asociado de Puerto Rico, ley magna y documento jurídico rector en nuestro ordenamiento, consigna en su Artículo II la Carta de Derechos una serie de derechos que tienen como base la inviolabilidad de la dignidad humana. Véase: Díaz v. Wyndham Hotel Corp., 155 DPR 364, 379 (2001). Al amparo de ello, se hace un pronunciamiento categórico en cuanto a la prohibición de discrimen en nuestro sistema legal. En particular, dispone: "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.". Constitución del ELA, Art. II, Sec. I. En lo que concierne a esta controversia, **se puede apreciar que hay una proscripción expresa al discrimen anclado en el sexo o género de una persona.**

En su Informe a la Convención Constituyente, la Comisión de la Carta de Derechos manifestó que el fin era "reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre". 4 Diario de Sesiones de la Convención Constituyente de

Puerto Rico 2561 (2003). Asimismo, esta Curia ha señalado que esta prohibición constitucional va dirigida a erradicar "premisas subjetivas, erróneas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconscientemente tiene su razón de ser en la caracterización de la mujer como sexo débil". Milán Rodríguez v. Muñoz, 110 DPR 610, 615 (1981).

Como se puede apreciar, la determinación del Tribunal de Apelaciones está predicada en una costumbre que encarna principios discriminatorios y diametralmente opuestos a los que nuestra Ley Suprema aspiró a desterrar de nuestro ordenamiento jurídico.

Sobre el segundo requisito, este Tribunal se ha pronunciado in extenso respecto al concepto de "orden público". Hemos expresado que se refiere al conjunto de valores eminentes que guían la existencia y el bienestar de una sociedad. Mun. De Poncev. A. C. et al, 153 DPR 1 (2000); De Jesus González v. A.C, 148 DPR 255 (1999); Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149(1976). El orden público tiene como finalidad el evitar que el Estado tenga que imponer algo que repugne al buen sentido de lo justo o de lo moral, es un concepto que tiende al bien común. Íd.

A modo de ilustración, nótese que el Civil Rights Act, piedra angular de las reclamaciones contra violaciones a los derechos civiles y humanos a poblaciones desventajadas o minoritarias en Estados Unidos, es claro al disponer que una costumbre que responde a un pasado discriminatorio no puede

ser considerada fuente de Derecho. Específicamente, en su sección 1981 dispone que todas las personas dentro de la jurisdicción de los Estados Unidos de América tendrán los mismos derechos y recibirán los mismos beneficios y protecciones establecidos por ley. Sobre este particular, indica lo siguiente:

> Every person who, under color of any statute, ordinance, regulation, **custom**, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to **the deprivation of any rights, privileges, or immunities secured by the Constitution and laws**, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[...]
> 42 USCA 1983 (Énfasis suplido).

Esta ley federal crea una causa de acción en contra de cualquier persona que utilice una ley, ordenanza, regulación o **costumbre** para discriminar en contra de otra al privarle de derechos, privilegios o inmunidades que surjan de alguna ley o de la Constitución. Ciertamente, tanto la Constitución del Estado Libre Asociado de Puerto Rico, en la primera sección de la Carta de Derechos, como la Constitución de los Estados Unidos de América, en su enmienda número diecinueve, prohíben el discrimen por razón de sexo. Art. II. Sec. 1, Const. ELA [Const. PR], LPRA, Tomo 1; Emda. XIX, Const. EE.UU., LPRA, Tomo 1.

La Corte Suprema de los Estados Unidos, en <u>Monell v. New York City Dept. of Social Services</u>, 436 US 658 (1978), especificó que la protección del Civil Rights Act en contra de la aplicación de una costumbre que le prive

inconstitucionalmente a un individuo de un derecho constitucional, incluye cualquier municipio u gobierno local. Asimismo, recalcó que la causa de acción que crea este estatuto protege en contra de costumbres discriminatorias, a pesar de que estas no hayan recibido una aprobación formal por parte del gobierno. Íd.

En suma, podemos observar cómo otras cortes estadounidenses se han rehusado a utilizar costumbres discriminatorias y arraigadas en el patriarcado como fundamento jurídico en sus decisiones sobre controversias relacionadas con los apellidos de menores. Por ejemplo, la Corte Suprema de Ohio, en Bobo v. Jewell, 38 Ohio St.3d 330, (1988), expresó que, si bien puede ser una costumbre nombrar a un niño con el apellido del padre, dar mayor peso al interés del padre no toma en cuenta que la madre tiene al menos el mismo interés en que el niño lleve el apellido materno. La Corte Suprema de Ohio explicó que en estos tiempos de igualdad entre los progenitores, argumentar que el hijo o hija de padres solteros debe llevar el apellido paterno basado en la costumbre **es otra forma de argumentar que está permitido discriminar simplemente porque la discriminación ha perdurado durante muchos años.** Un argumento basado en esta premisa es insostenible.

La Corte de Apelaciones del Distrito de Florida empleó un razonamiento similar al negarse a cambiar el apellido materno de un menor, que fue inscrito primero, por el paterno. Nuevamente, la Corte enfatizó que hacer el referido

cambio basándose en que la costumbre en esa jurisdicción dicta que los hijos e hijas usualmente llevan el apellido paterno sería un error y estaría perpetuando un discrimen simplemente porque por mucho tiempo se ha estado discriminando en contra de la mujer. Girten v. Andreu, 698 So.2d 886 (1997).

### B. Tratamiento del orden de los apellidos en otras jurisdicciones

Aunque el derecho puertorriqueño nos provee varias opciones no discriminatorias para resolver este caso, aprovecho la oportunidad para reseñar algunas de las soluciones no discriminatorias que han implementado otras jurisdicciones para atender controversias similares.

En España, por ejemplo, el Artículo 109 del Código Civil autoriza a los progenitores a escoger el orden de los apellidos de sus hijos o hijas. Ahora, cuando los progenitores no logran ponerse de acuerdo, la Ley del Registro Civil de España (Ley 20-2011 del 21 de julio de 2011) atiende esta controversia en su Artículo 49:

> En caso de desacuerdo o cuando no se hayan hecho constar los apellidos en la solicitud de inscripción, el Encargado del Registro Civil requerirá a los progenitores, o a quienes ostenten la representación legal del menor, para que en el plazo máximo de tres días comuniquen el orden de apellidos. Transcurrido dicho plazo sin comunicación expresa, **el Encargado acordará el orden de los apellidos atendiendo al interés superior del menor.**

Como vemos, en España es el Encargado del Registro quien decide el orden de los apellidos del primer hijo o

hija ante un impase de los progenitores y el criterio para decidir está predicado en el mejor interés del menor.

Similar disposición existe en México. En el 2020 el Pleno de la Cámara de Diputados aprobó una modificación del artículo 58 del Código Civil Federal y 19 de la Ley General de los Derechos de Niñas, Niños y Adolescentes, con el objetivo de que el acta de nacimiento contenga el nombre propio y los apellidos de los progenitores en el orden de prelación que convengan. Además, cuando no haya acuerdo entre los progenitores, un juez del Registro Civil decidirá el orden de los apellidos, tomando como criterio rector el mejor interés del menor.

Por otro lado, en Argentina, el artículo 64 de su Código Civil indica que el hijo o hija matrimonial lleva el primer apellido de alguno de los cónyuges; en caso de no haber acuerdo, se determina por sorteo realizado en el Registro del Estado Civil y Capacidad de las Personas. Similares procedimientos fueron creados mediante ley en Colombia y Chile, donde el orden de los apellidos se escoge mediante un sorteo cuando no existe acuerdo entre los progenitores.

En Estados Unidos, específicamente en el estado de Florida la norma general es que el hijo o hija solamente lleva un apellido. Sin embargo, si los progenitores no se ponen de acuerdo con cuál apellido se inscribirá, entonces se inscriben ambos apellidos en orden alfabético.

Como podemos apreciar, otras jurisdicciones han enfrentado la pregunta sobre qué hacer cuando los

progenitores de un hijo o hija no se pueden poner de acuerdo con el orden de los apellidos a inscribir, y han encontrado al menos tres soluciones distintas: 1) un sorteo al azar; 2) un funcionario estatal decide, usando como criterio el mejor interés del menor; y 3) orden alfabético. La ventaja que tienen estas tres soluciones por encima de la aplicación del principio del uso y la costumbre como fuente de Derecho, es que no toman en consideración el género del progenitor al momento de establecer el orden de los apellidos. Estas soluciones son justas, equitativas y ciegas al género de la persona de quien proviene cada apellido.

Por su parte, la Corte Europea de Derechos Humanos también se ha expresado sobre controversias relacionadas al trato desigual entre un hombre y una mujer al momento de decidir el orden en el cual se inscribirán los apellidos de un hijo o hija procreada entre estos.

En el 2021 en <u>León Madrid v. Spain</u>, application no. 30306/13,[3] la Corte Europea de Derechos Humanos atendió una controversia en la cual se cuestionó una ley que establecía que en el caso en que los progenitores no se pongan de acuerdo con el orden de los apellidos de un hijo o hija, automáticamente se inscribiría el apellido paterno en primer lugar y el materno en segundo. La Corte señaló que la referida norma trataba a dos personas, la madre y el padre del niño, de manera diferente y que la distinción se

---

[3] *Véase* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-212688%22]}.

basaba exclusivamente en el sexo. Afirmó que su tarea era determinar si la diferencia de trato basada en el sexo, al anteponer el apellido del padre en caso de desacuerdo entre los padres, era contraria a los artículos 8 y 14 de la Convención Europea de Derechos Humanos.[4] El Tribunal hizo hincapié en que el contexto social actual en España no correspondía al que había existido en el momento de la adopción de la legislación que había sido aplicable al caso en cuestión. Destacó que desde el 1950 se han producido en el país una serie de cambios sociales que han tenido como consecuencia el abandono del concepto patriarcal de familia que había predominado en el pasado. España, miembro del Consejo de Europa desde el 24 de noviembre de 1977, había cumplido sus compromisos en este sentido y había adoptado numerosas medidas encaminadas a la igualdad de género en la sociedad española, de acuerdo con las resoluciones y recomendaciones adoptadas en el seno de dicha Organización. Además, reiteró que las referencias a presuntas tradiciones generales o sociales mayoritarias y las actitudes prevalecientes en un determinado país no son suficientes para justificar una diferencia de trato por motivos de sexo. Tras exponer su análisis, la Corte concluyó que la referida

---

[4] El artículo 8 establece que toda persona tiene derecho a un recurso efectivo ante los tribunales nacionales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la constitución o por la ley. Por su parte, el artículo 14 asegura que el disfrute de los derechos y libertades reconocidos en la Convención Europea de Derechos Humanos debe garantizarse, sin distinción alguna basada en el sexo, raza, color, idioma, religión, opiniones políticas, origen nacional o social, pertenencia a una minoría nacional, fortuna, o nacimiento.

diferencia de trato basada en el sexo en efecto era contraria a los artículos 8 y 14 de la Convención Europea de Derechos Humanos.

Por otro lado, en el 2014 en <u>Cusan and Fazzo v. Italy</u>, application no.77/07,[5] se cuestionó una norma que dictaba que hijos o hijas automáticamente recibían el apellido de su padre y no el de su madre. La Corte primero definió el discrimen como una diferencia de trato a personas en situaciones análogas, **sin una justificación objetiva y razonable.** Además, la justificación para el trato desigual debe evaluarse en relación con los principios que normalmente prevalecen en las sociedades democráticas. La Corte reiteró que en su jurisprudencia ha exaltado la importancia de avanzar hacia la igualdad de género y erradicar toda discriminación por razón de sexo en la elección de apellidos. Consecuentemente, llegó a la conclusión de que la tradición de conferir el apellido del padre a todos los miembros de una familia no puede justificar la discriminación contra la mujer. En el caso bajo su consideración en ese momento, la elección del apellido del niño se determinaba únicamente en función del sexo de los padres, ya que la regla en cuestión exigía que el apellido dado fuera el del padre. Además, señaló que el propio Tribunal Constitucional Italiano había reconocido que el sistema tiene sus raíces en un concepto patriarcal de la

---

[5] *Véase* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-139896%22]}.

familia que no era compatible con el principio constitucional de igualdad entre hombres y mujeres. Por tanto, concluyó que la referida norma era contraria a los artículos 8 y 14 Convención Europea de Derechos Humanos.

Obsérvese que, en ambos casos, los cuales versaban sobre una controversia relacionada con el trato desigual entre un padre y una madre al momento de inscribir los apellidos de un hijo o hija en común, la Corte contextualizó la controversia como una violación de Derechos Humanos. **Esto así, porque era una manifestación concreta e inequívoca de discrimen en contra de una mujer por razón de su sexo, lo cual estaba prohibido por la Convención Europea de Derechos Humanos y por la constitución de los países involucrados.** En estos casos no hubo debate en cuanto a que la norma del orden mandatorio de apellidos a favor del hombre proviene de un origen discriminatorio y de una visión de mundo androcéntrica, donde los derechos, libertades y valor de la mujer es inferior a la del hombre como cabeza y protagonista de todas las instituciones, en particular la familiar.

### III

En este caso, el Tribunal de Apelaciones se equivocó al revocar al Tribunal de Primera Instancia y ordenar que en el Registro Demográfico se hiciera constar primero el apellido paterno. Al determinar que el Tribunal de Primera Instancia incurrió en pasión, perjuicio, parcialidad o error manifiesto, el Tribunal de Apelaciones ni siquiera explicó en cuál de estas modalidades incurrió el Tribunal de Primera

Instancia al mantener el apellido materno en primer lugar, particularmente ante la inexistencia de una ley que dictara el orden en que se deben inscribir los apellidos cuando no hay consenso entre los progenitores. El Tribunal de Primera Instancia, reconociendo que no existía ley en Puerto Rico que dispusiera del orden de los apellidos, de manera transparente, objetiva y racional, colocó el apellido del señor Cintrón Román en el lugar anteriormente ocupado por la señora Rodríguez Ocasio, esposa de la señora Jiménez Echevarría y madre biológica del menor. Es mi criterio que el Tribunal de Primera Instancia no erró al mantener el apellido materno en el primer lugar, como fue inscrito desde un principio, ya que nada en nuestro ordenamiento obliga al Tribunal a variar unilateralmente el orden. Nada justificaba el ejercicio del Tribunal de Apelaciones de entrar e intervenir con esta determinación judicial.

En segundo lugar, erró el Tribunal de Apelaciones al recurrir a la costumbre como fuente de derecho para resolver la controversia. La llamada costumbre de interponer automáticamente el apellido paterno antes del materno es el producto de unos valores engranados en el patriarcado y que son inherentemente discriminatorios. Jurídicamente no procede que el Tribunal de Apelaciones, so color de llenar un vacío legislativo, procediera a decretar como un "abuso de discreción, prejuicio, error manifiesto o parcialidad" una solución justiciera, no discriminatoria y razonable adoptada por el Tribunal de Primera Instancia, para

sustituirla por un remedio cuyo único fundamento es nuestro largo historial de trato desigual contra la mujer. No hay ninguna duda de que la señora Jiménez Echevarría no prevaleció ante el Tribunal de Apelaciones exclusivamente por razón de que ella es la madre del menor y el apellido del padre, en ausencia de acuerdo entre las partes, debe prevalecer. Según el Tribunal de Apelaciones, ante el silencio legislativo la solución más justiciera era, ordenar el cambio en el orden del apellido de la madre biológica ya consignado en el Registro para ser sustituido por el del padre, porque así lo dispone "la costumbre". Es francamente decepcionante la posición del Tribunal de Apelaciones.

En las últimas décadas nuestra sociedad ha superado enormes escollos y se han logrado múltiples avances encaminados hacia establecer la igualdad entre las personas, sea por sexo, género, raza u otras motivaciones discriminatorias alguna vez toleradas por nuestras instituciones. Por esta razón, entre otras, es errado que, al resolver esta controversia, descansemos en una costumbre que es, más que nada, una reliquia de unos principios discriminatorios que ya no tienen lugar en nuestro ordenamiento ni en nuestra sociedad. Por el contrario, he enfatizado en distintas ocasiones la importancia de que nuestros tribunales adjudiquen con perspectiva de género al abordar controversias en las cuales tal elemento es

jurídicamente relevante.[6]

Finalmente, otras jurisdicciones y tribunales, tanto estatales como internacionales, se han enfrentado a esta misma controversia. En vez de anclarse en costumbres anquilosadas similares a la que usó el Tribunal de Apelaciones para resolver y cementar estos valores y principios discriminatorios, han interpretado el estado de Derecho a la luz de los principios de jerarquía superior de igualdad y no discriminación. Existen variadas soluciones justicieras para determinar el orden de los apellidos a falta de consenso entre los progenitores: 1) un sorteo al azar; 2) un funcionario estatal o un magistrado decide usando como criterio el mejor interés del menor; y 3) orden alfabético. Todas estas soluciones tienen criterios objetivos o son neutrales al sexo del progenitor. No puede ser que, teniendo opciones mejores y más justas —con lo que concurrimos una mayoría de los que integramos este Tribunal Supremo—, permitamos que se recurra a una costumbre que choca de manera frontal con el principio de igualdad que consagra nuestra Constitución y que abiertamente discrimine en contra de la mujer por una visión androcéntrica impermisible.

---

[6] Véase: <u>Cruz Flores v. Hospital Ryder Memorial Inc.</u>, 2022 TSPR 112 (Opinión de Conformidad en parte y Disidente en parte de la Jueza Presidenta Oronoz Rodríguez); <u>Pérez Rodríguez v. López Rodríguez</u>, 2022 TSPR 95 (Opinión de Conformidad de la Jueza Presidenta Oronoz Rodríguez); <u>Equipo Sanjuaneras de la Capital v. Federación Puertorriqueña de Voleibol</u>, 208 DPR 238 (2021) (Voto particular disidente de la Jueza Presidenta Oronoz Rodríguez)

IV

Al recurrir a una costumbre discriminatoria, machista y arraigada en el patriarcado en búsqueda de una solución a un problema jurídico, estamos dando un paso atrás en el camino hacia la igualdad en vez de mirar hacia el futuro y proponer una solución que nos mueva a progresar como una sociedad que valora la justicia y la equidad entre el hombre y la mujer. Es incomprensible que en el año 2023 todavía nos encontremos con decisiones de nuestros tribunales que abiertamente basan sus argumentos en una costumbre discriminatoria que se desarrolló dentro de unos preceptos patriarcales ya insostenibles. No puedo, en buena conciencia, dar mi apoyo a este proceder. Por esta razón, disiento enérgicamente del proceder de este Tribunal, que con su silencio, ha tolerado una determinación indefendible en principio y en Derecho.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Anthony Cintrón Román<br><br>Recurrido<br><br>v.<br><br>Charline Michelle Jiménez Echevarría por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR<br><br>Peticionaria | CC-2023-0049 | Certiorari |

Voto particular disidente emitido por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 2 de mayo de 2023.

> If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied.
>
> - Obergefell v. Hodges, 576 US 644, 671 (2015).

El bloque mayoritario conservador del Tribunal Supremo de Puerto Rico, con el saldo de sus posturas, ha perpetuado una costumbre machista que es inequívocamente inconstitucional. Por un lado, un sector de esa Mayoría se rehúsa a reconocer las fuentes de Derecho que invalidan la aplicación de una costumbre patriarcal que proviene de

épocas en que, lamentablemente, imperaba la desigualdad de género. En ese afán, se pretende delegar al Poder Legislativo la función de decretar que esta costumbre es contraria a fuentes de Derecho de mayor jerarquía. Ello implica dar la espalda a la firme línea jurisprudencial mundial —que incluye a los Estados Unidos— en la que se ha desterrado esa costumbre patriarcal para atender controversias similares. Como agravante, ese sector también pretende ignorar que la Asamblea Legislativa de Puerto Rico, al aprobar el nuevo Código Civil de 2020, le dio la espalda a esa costumbre machista por ser discriminatoria y contraria a la igualdad de género que debe regir en este tipo de controversias. Como veremos, así consta expresamente en el historial legislativo.

Por su parte, otro sector del bloque mayoritario, aunque reconoce que el criterio rector debe ser el "mejor interés del menor", descarta adoptar los criterios jurisprudenciales de múltiples jurisdicciones de avanzada —incluyendo los Estados Unidos— que incorporan factores cualitativos y sustantivos dirigidos a proteger efectivamente el mejor interés del menor, tal y como son reconocidos en este <u>Voto particular disidente</u>. Por el contrario, ese sector mayoritario acude a criterios aleatorios contenidos en una pieza legislativa que ni siquiera ha sido aprobada por ambos cuerpos. Bajo esa lógica, ¿se imaginan al Departamento de la Familia o al

Registro Demográfico tomando decisiones tan trascendentales sobre la vida de un menor echando una moneda al aire o basado en el orden alfabético de los apellidos de los progenitores? Claramente no puedo avalar un razonamiento tan alejado del Derecho de Familia y de las normas aplicables que discutiremos en este disenso. Nuevamente, el sector mayoritario se desenfoca y no posa su mirada en la búsqueda genuina y verdadera del interés óptimo del menor.

En esa línea, la controversia que hoy se nos plantea versa sobre una madre que **inscribió** a su hijo con el apellido materno en el primer orden y, **posteriormente**, el padre del menor solicitó con éxito que se **enmendara** el certificado de nacimiento con el propósito de que fuese su apellido el que tuviese prelación sobre el de la madre.

Hoy, este Tribunal se rehúsa a expedir el recurso y, consecuentemente, revocar el dictamen del foro apelativo intermedio que ordenó al Registro Demográfico a revertir la inscripción y colocar en primera posición el apellido paterno. El fundamento para tal conclusión está predicado, no en una ley, sino en el hecho de que en Puerto Rico rige una costumbre que presupone que primero se ubica el apellido del papá y luego el de la mamá.

**Toda vez que la Mayoría, con el saldo de sus posturas y la denegatoria del recurso que nos ocupa, permite que se perpetúe una costumbre con orígenes patriarcales que**

**propende al discrimen contra la mujer, que atenta directamente contra la ley y violenta múltiples garantías constitucionales, <u>disiento</u>.**

Procedo, entonces, a exponer los antecedentes fácticos que orientan mi disenso.

**I**

En el 2021, el Sr. Anthony Cintrón Román (señor Cintrón Román) presentó una demanda en contra de la Sra. Charline M. Jiménez Echevarría (señora Jiménez Echevarría) y su esposa, la Sra. Ruth N. Rodríguez Ocasio (señora Rodríguez Ocasio) (en conjunto, matrimonio Jiménez-Rodríguez). En suma, alegó que a finales de abril de 2021 nació un menor producto de una relación que sostuvo con la señora Jiménez Echevarría y que, a pesar de ser el padre biológico, el matrimonio lo inscribió en el Registro Demográfico como su hijo.[1] Por tal razón, impugnó la maternidad de la señora Rodríguez Ocasio, esposa de la madre biológica, y reclamó la filiación con su hijo.

Oportunamente, el matrimonio Jiménez-Rodríguez contestó la demanda y adujo que inscribieron al menor MMR con los apellidos Jiménez Rodríguez, conforme con el estado de Derecho vigente. No obstante, solicitaron que, de decretarse la filiación solicitada, **el primer apellido del menor continuara siendo el correspondiente al de la madre**

---

[1] De entrada, resalto que el uso de "MMR" para hacer referencia al menor se realiza con el propósito exclusivo de proteger su identidad.

**biológica —este es, Jiménez—, conforme fue inscrito en el Registro Demográfico.** Por su parte, el señor Cintrón Román reclamó que, tal y como es el uso y la costumbre en Puerto Rico, se ordenara que el primer apellido de MMR fuera el suyo y que se colocara en segunda posición el de la madre biológica.

Tras varios trámites procesales, a mediados de 2022 el Tribunal de Primera Instancia emitió una <u>Sentencia</u> mediante la cual, tras un acuerdo entre las partes, determinó que MMR es hijo de la señora Jiménez Echevarría y el señor Cintrón Román. Por tanto, ordenó que en el certificado de nacimiento del menor **<u>se sustituyera</u>** el nombre de la señora Rodríguez Ocasio por el del señor Cintrón Román para que surgiera que este último es el padre.[2] Ahora bien, en cuanto a la divergencia de este con respecto al orden de los apellidos, el foro primario dispuso lo siguiente: **"el Registro Demográfico mantendrá a la madre en la primera entrada y al padre en la segunda entrada de forma tal que el nombre del menor sea [MMR] Jiménez Cintrón".**[3]

---

[2]Asimismo, el Tribunal de Primera Instancia hizo una serie de determinaciones provisionales en cuanto a la custodia, las relaciones paternofiliales y la pensión alimentaria. Advierto que se optó por no detallarlas por razón de que tales determinaciones no son relevantes para la controversia ante nuestra consideración.

[3](Negrilla suplida). Nótese que, según surge del récord judicial, la defensora judicial, Lcda. Olga E. López Báez, expresó que la cuestión de los apellidos "es un asunto de estricto derecho, [pero] expresa que hay que ver de dónde proviene ese orden patriarcal que establecía que tenía que

En desacuerdo, el señor Cintrón Román acudió al Tribunal de Apelaciones y, en esencia, señaló que el foro primario erró al: (1) no resolver la controversia de los apellidos conforme al uso y costumbre de nuestro País, e (2) impedir que el apellido del padre del menor esté en primer lugar al momento de la inscripción de la filiación en el Registro Demográfico con el fin de invisibilizar al padre.

Ante este escenario, el foro apelativo intermedio determinó que la Ley del Registro Demográfico de Puerto Rico, infra, no dispone en qué orden deben ir los apellidos de un menor en caso de que sus padres estén en desacuerdo. Además, apuntaló que, ante el vacío existente, correspondía acudir a los Arts. 2 y 4 del Código Civil de Puerto Rico de 2020, infra, los cuales establecen y regulan la costumbre como una fuente de Derecho. Tras ello, el Tribunal de Apelaciones particularizó lo siguiente:

> Así pues, ante el desacuerdo de los progenitores sobre la inscripción del orden de los apellidos del menor MMR, impera en nuestro sistema de derecho la norma consuetudinaria de que la persona natural será inscrita con el apellido paterno en primer orden y el apellido materno en segundo orden. **Aunque estamos consciente de que dicha costumbre se hilvanó dentro de unos preceptos de una sociedad patriarcal,**

---

ser el padre primero y la madre segunda. Está en contra de eso y favorece que permaneciera con el apellido materno". Véase, Apéndice del certiorari, Minuta, pág. 155.

> **bien reconocemos que la misma no es contraria a la moral o al orden público.**[4]

Basado en lo anterior, el foro apelativo intermedio revirtió el dictamen del foro recurrido y ordenó al Registro Demográfico a enmendar el certificado de nacimiento del menor MMR para que el apellido del padre y la madre estuviesen en ese orden.

Inconforme, la señora Jiménez Echevarría, por sí y en representación del menor MMR, y la señora Rodríguez Ocasio, acudieron vía Certiorari a este Tribunal. En lo pertinente, plantean que el foro apelativo intermedio erró al ordenar que, en ausencia de ley aplicable, reinara una costumbre que atenta contra nuestro ordenamiento constitucional.

Confrontados con tal cuadro fáctico, hoy este Tribunal se niega a expedir y pautar en una controversia novel y de alto interés público. Ante ello, **disiento.**

En consecuencia, procedo a exponer los fundamentos jurídicos en los que se enmarca mi postura. Veamos.

**II**

**A.**

El Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 et seq., (Código Civil de 2020), regula, entre otros asuntos, las fuentes de Derecho que rigen en la Isla. A esos efectos, tal disposición establece que:

---

[4] (Negrilla suplida). Apéndice del certiorari, Sentencia, págs. 180-181.

> **Las fuentes del ordenamiento jurídico puertorriqueño son <u>la Constitución</u>, <u>la ley</u>, <u>la costumbre</u> y los principios generales del Derecho.**
>
> La jurisprudencia complementa el ordenamiento jurídico con la doctrina que establezca el Tribunal Supremo al interpretar y aplicar la Constitución, la ley, la costumbre y los principios generales del Derecho.[5]

Cónsono con ello, este Tribunal ha sido enfático en que, al resolver una controversia, los tribunales deben atenerse, primeramente, a lo dispuesto en la Constitución de Puerto Rico.[6] Luego, deben regirse por las leyes

---

[5] (Negrilla suplida). 31 LPRA sec. 5312. Señalo que esta disposición estuvo precedida por el Art. 7 del Código Civil de 1930, el cual fue derogado con la aprobación del Código Civil de 2020. La disposición derogada leía como sigue:

> El tribunal que rehúse fallar a pretexto de silencio, obscuridad, o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.
>
> Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos.

Para un análisis comparativo del Código Civil de 2020 y su predecesor, así como una lista de equivalencia entre ambos códigos, véase, <u>Código Civil 2020 comparado con el Código Civil 1930</u>, L. Matos Cáez, Puerto Rico Constitution Center, <u>https://constitutionpr.com/2020/07/01/codigo-civil-2020-comparado-con-el-codigo-civil-1930/</u> (última visita, 1 de mayo de 2023).

[6] <u>Noriega v. Gobernador</u>, 122 DPR 650, 680 (1988). Lo anterior, claro está, sin perjuicio de la prelación de las fuentes de Derecho federales en los casos y controversias aplicables.

promulgadas por la Asamblea Legislativa y, en ausencia de disposición legal aplicable, por las costumbres.[7]

En cuanto a la costumbre, el Art. 4 del Código Civil de 2020, 31 LPRA sec. 5314, reconoce que esta "**solo rige en ausencia de ley aplicable, si no es contraria a <u>la moral o al <u>orden público</u></u>** y si se prueba su espontaneidad, generalidad y constancia".[8] Estas exigencias responden al hecho de que no toda costumbre puede ser considerada como una fuente de Derecho. Así pues, con el propósito de identificar la validez de una costumbre en relación con la ley, los tratadistas las han clasificado del modo siguiente:

> [1] **costumbre <u>secundum legem</u>**, cuando la costumbre no se aparta de lo dispuesto en la ley, lo reitera o lo concreta; [2] **costumbre <u>contra legem</u>**, si la costumbre contradice la ley, y [3 **costumbre] <u>praeter legem</u>**, cuando faltando ley sobre la misma materia regulada consuetudinariamente falta, por ende, la referencia necesaria para determinar si la costumbre es o no acorde con [a]quella.[9]

---

[7] Íd. En cuanto a los principios generales del Derecho, nótese que estos aplican en ausencia de ley o costumbre. **Lo anterior, claro está, sin perjuicio del carácter ilustrador que proveen en nuestro ordenamiento jurídico.** 31 LPRA sec. 5315.

[8] (Negrilla y subrayado suplidos). Íd.

[9] (Negrilla y subrayado suplidos). A. Hernández-Gil Álvarez-Cienfuegos y E. Zuleta Puceiro, <u>El tratamiento de la costumbre en la codificación civil hispanoamericana</u>, Madrid, 1976, pág. 76. Véase, además, G. Savastano, <u>La costumbre como fuente del derecho: sistema jurídico argentino y comparado</u>, págs. 725-727, https://nsuworks.nova.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1669&context=ilsajournal (última visita,

En lo que nos concierne, resalto que una costumbre _contra legem_ —o sea, contra la ley— es una costumbre que regula o interpreta cierta materia en oposición a alguna disposición legal. Una interpretación congruente, dirigida a no validar una **costumbre contraria a la Constitución o a la ley** encuentra su lógica jurídica en el hecho de que la reiteración de una serie de actos ilícitos no puede convertirse, mediante una transmutación mágica, en actos lícitos.[10] De otro lado, la costumbre _praeter legem_ cobra eficacia en aquellos escenarios en los que existe una laguna en la Constitución o la ley, por lo que no existe un choque entre estas.[11]

Ante ese cuadro, "la prevalencia de la costumbre no puede obviar la aplicación del bloque de la legalidad vigente, por lo que no puede contrariar el orden público,

---

1 de mayo de 2023); L. Diez-Picazo, _La doctrina de las fuentes del Derecho_, https://dialnet.unirioja.es/descarga/articulo/46628.pdf (última visita, 1 de mayo de 2023).

[10]M. Calleja, _La Costumbre como fuente del derecho_, pág. 8, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiXmd-DvMD-AhURVTABHWP9AeQQFnoECAsQAQ&url=http%3A%2F%2Fwww.derecho.unlz.edu.ar%2Falumnos%2F30%2520calleja%2Farchivos%2FLA%2520COSTUMBRE%2520COMO%2520FUENTE%2520DEL%2520DERECHO.doc&usg=AOvVaw0J91l1xjbilvnWcSXNP39D (última visita, 1 de mayo de 2023).

[11]Íd., pág. 7.

ni son admisibles las llamadas costumbres <u>contra legem</u>".[12] **Por tanto, una costumbre se considerará válida como fuente de Derecho únicamente si no vulnera la Constitución o alguna ley y, además, si no quebranta la moral o el orden público de nuestro ordenamiento jurídico.**

Por su pertinencia, conviene exponer brevemente la norma atinente a los conceptos de la moral y el orden público.

**B.**

Reiteradamente, este Tribunal ha definido el <u>orden público</u> como el conjunto de valores eminentes que guían la existencia y el bienestar de una sociedad y que, a su vez, recoge y ampara un interés social dominante por los derechos que tiende a proteger. <u>Pérez Rodríguez v. López Rodríguez</u>, 2022 TSPR 95, pág. 13 (2022) (citando a <u>Consejo de Titulares v. C.R.U.V.</u>, 132 DPR 707 (1993); <u>Unisys v. Ramallo Brothers</u>, 128 DPR 842 (1991); <u>Hernández v. Méndez & Assoc. Dev. Corp.</u>, 105 DPR 149, 153-154 (1976)). Así pues, el orden público es en gran medida un "acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, **constituyen principios rectores de sabio**

---

[12]D. Medina Bacallado, <u>La costumbre como fuente del derecho administrativo</u>, pág. 21, https://riull.ull.es/xmlui/bitstream/handle/915/14875/La%20costumbre%20como%20fuente%20del%20Derecho%20Administrativo.%20.pdf?sequence=1&isAllowed=y (última visita, 1 de mayo de 2023).

**gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin[,] por el estilo de una sociedad"**. (Negrilla suplida). De Jesús González v. A.C., 148 DPR 255, 264 (1999)(citando a Hernández v. Méndez & Assoc. Dev. Corp., supra, págs. 153-154).

Por otra parte, el concepto de la moral se refiere a "aquellos **principios o preceptos morales no discutibles y sí generalmente admitidos.** Estos, por lo común, no conciernen al orden jurídico **sino al fuero público o al respeto humano"**. (Negrilla suplida). Negrón v. Sucn. Izquierdo, 46 DPR 660, 668 (1934). Un acto en específico es contrario a la moral si su concreción "trata de inmovilizar la voluntad jurídica del [individuo] dentro de una concepción pragmática de un estado ideal, **concebido en abstracto, con la correspondiente merma en los valores humanos"**. (Negrilla suplida). Flores v. Municipio de Caguas, 114 DPR 521, 527 (1983) (citando a C.R.U.V. v. Peña Ubiles, 95 DPR 311, 317 (1967)).

Tras esbozar la normativa de ambos conceptos, procedo a ilustrar su convergencia con el Derecho referente al nombre y los apellidos en nuestra jurisdicción.

### III

### A.

Históricamente, el nombre de una persona encuentra su razón de ser en la necesidad apremiante de identificar a

cada individuo y distinguirlo del resto de los miembros de la sociedad.[13] En ese sentido, el nombramiento de una persona de una forma en particular goza de una preeminencia mayor debido a las consideraciones constitucionales y por las implicaciones que ello acarrea en su vida social y jurídica.[14]

Por ese motivo, mediante la Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1041 et seq., se creó un Registro General Demográfico (Registro Demográfico), el cual tiene a su cargo, entre otros asuntos, la inscripción de los nacimientos, casamientos y defunciones que ocurran o se celebren en Puerto Rico. Íd., sec. 1071. En cuanto a los nacimientos, la ley antes citada requiere que se haga una declaración de este hecho mediante un certificado de nacimiento que deberá ser entregado en el Registro Demográfico. Íd., sec. 1131. El certificado requiere que se suministre cierta información —entre esta, el "[n]ombre y los apellidos del niño"— para determinados propósitos legales, sociales y sanitarios que se persiguen con la inscripción. Véase, Íd., secs. 1131, 1131(3).

Por su parte, con la aprobación de la reforma del Código Civil de 2020, se incorporaron ciertas disposiciones atinentes al nombre, las cuales deben examinarse en

---

[13]M. Linacero de la Fuente, El nombre y los apellidos, Madrid, Ed. Tecnos, pág. 19.

[14]Íd.

conjunto con lo dispuesto en la Ley del Registro Demográfico.[15] Sobre el particular, el Art. 82 del Código Civil de 2020, 31 LPRA sec. 5541, dispone que **"[t]oda persona natural tiene el derecho a tener y a proteger su nombre, que debe inscribirse en el Registro Demográfico de conformidad con la ley.** No se inscribirán nombres ofensivos a la dignidad de la persona".[16] Acto seguido, el Art. 83 del Código Civil de 2020, 31 LPRA sec. 5542, detalla que "[e]l nombre de una persona comprende el nombre propio o individual unido al primer apellido de sus progenitores".

**No cabe duda, pues, que tanto la Ley del Registro Demográfico como el Código Civil de 2020 regulan la inscripción del nombre de un hijo con sujeción, únicamente, a que conste el primer apellido de los progenitores. Nótese la ausencia de orden preferente en cuanto al apellido de alguno de los progenitores.**

Como veremos, esto es así en consideración a las garantías constitucionales reconocidas en las

---

[15]"La inscripción, alteración o modificación del nombre siempre se regularon por la Ley del Registro Demográfico, Ley Núm. 24 de 22 de abril de 1931, según enmendada. **Ahora, en el título XI del Libro Segundo sobre las Instituciones Familiares, se regulan estos procesos con cierta especificidad, lo que también es un logro muy positivo y puntual de la reforma"**. (Negrilla suplida). M. Fraticelli Torres, La persona natural y las instituciones familiares en el derecho puertorriqueño: una mirada axiológica a los libros primero y segundo del nuevo Código Civil de Puerto Rico, en L. Muñíz Argüelles, El Código Civil de Puerto Rico de 2020: primeras impresiones, San Juan, Fideicomiso Esc. Derecho UPR, 2021, pág. 62.

[16](Negrilla suplida). Íd.

Constituciones de Puerto Rico y de Estados Unidos que discutiremos a continuación.

**B.**

Nuestra Constitución consagra el principio cardinal de la inviolabilidad de la dignidad de las personas. Art. II, Sec. 1, Const. PR, LPRA, Tomo 1. Con el motivo de propiciar la igualdad humana, se establece que todos los hombres y las mujeres son iguales ante la ley y, a su vez, se prohíbe el establecimiento de discrimen alguno por, entre otros motivos, el sexo. Íd. A base de ello, la Constitución de Puerto Rico reconoce que las personas tienen un derecho fundamental a la intimidad y la protección contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Íd., Art. II, Secs. 1 y 8.

En reiteradas ocasiones, este Tribunal ha señalado que el Derecho a la intimidad se lesiona "entre otras instancias, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas […]". Siaca v. Bahía Beach Resort, 194 DPR 559, 585 (2016); Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 910 (2010); Soc. de Gananciales v. Royal Bank de P.R., 145 DPR 178, 201 (1998); Pueblo v. Duarte Mendoza, 109 DPR 596 (1980); Figueroa Ferrer v. E.L.A., 107 DPR 250 (1978).[17]

---

[17]En aras de proteger en su máxima acepción este Derecho, el Estado tiene una doble función: primero, abstenerse de actuar de modo que viole la autonomía e intimidad individual; segundo, actuar afirmativamente en

Por su parte, el derecho fundamental de los progenitores a tomar decisiones **libremente** con respecto a la crianza de sus hijos también está firmemente establecido en la esfera federal. Véase, Troxel v. Granville, 530 US 57, 77 (2004) ("The liberty interest at issue in this case— the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); Washington v. Glucksberg, 521 US 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bills of Rights, the 'liberty' specially protected by the Due Process Clause includes the right [...] to [...] direct the [...] upbringing of one's children."); Santosky v. Kramer, 455 US 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child."); Quilloin v. Walcott, 434 US 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); Cleveland Bd. of Educ. v. LaFleur, 414 US 632, 639-640 (1974)("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."). Véase, además, Henne v.

_____

beneficio del individuo. Véase, Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 910 (2010).

Wright, 904 F.2d 1208, 1217 (8vo Cir. 1990) (Opinión concurrente en parte y disidente en parte del Circuit Judge, Arnold) ("The right to name one's child seems to me, if anything, more personal and intimate, less likely to affect people outside the family, than the right to send the child to a private school, Pierce v. Society of Sisters, 268 US 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), or to have the child learn German, Meyer v. Nebraska, 262 US 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).").[18]

Por ello, en reconocimiento de la multiplicidad de derechos constitucionales que revisten las decisiones de los progenitores con respecto a sus hijos, en Roig Pou y otros v. Reg. Demográfico, 201 DPR 403 (2018) (Voto particular disidente emitido por el Juez Asociado Señor Estrella Martínez), condené la renuencia del Registro Demográfico en conceder la petición de unos padres que pretendían unir mediante un guión el apellido paterno y materno en el nombre de sus hijos.

En reconsideración, este Tribunal —**unánimemente**, aunque por motivos distintos—, permitió que se modificara el apellido de los menores, según fue peticionado por sus padres. Véase, Roig Pou y otros v. Reg. Demográfico, 203

---

[18]Véase, además, Jech v. Burch, 466 F. Supp. 714 (D. Haw. 1979); Sydney v. Pingree, 564 F. Supp. 412 (S.D. Fla. 1983). Para una discusión de los casos antes citados, véase, Roig Pou y otros v. Reg. Demográfico, 201 DPR 403, 408-409 (2018) (Voto particular disidente emitido por el Juez Asociado Señor Estrella Martínez).

DPR 346, (2019) (Sentencia). En esa ocasión, si bien se concedió la modificación en los apellidos, critiqué que se evitara reconocer la prerrogativa constitucionalmente protegida de los padres a tomar decisiones íntimas y personales en el núcleo familiar respecto a sus hijos como fundamento jurídico de la decisión. Íd., págs. 366-377 (Opinión de conformidad del Juez Asociado Señor Estrella Martínez). Máxime por razón de que **"cuando una rama de gobierno se inmiscuye indebidamente con la Constitución, un fundamento puramente estatutario puede ser insuficiente para restituir el sano balance de poderes. En este caso, la solución judicial adecuada y completa ameritaba adentrarnos en la esfera constitucional como garantes de las libertades individuales"**. (Negrilla suplida). Id., pág. 377.

**IV**

La controversia ante nuestra consideración requiere, ante todo, precisar lo siguiente: ¿nuestro ordenamiento jurídico prohíbe que se inscriba a un menor con el apellido materno seguido del paterno? **<u>Indudablemente, no</u>**.[19]

---

[19]Resalto que los Arts. 557 y 558 del Código Civil de 2020, 31 LPRA secs. 7103 y 7104(a), disponen que la filiación natural determinará los apellidos de la persona natural, así como que el hijo tiene derecho a llevar el apellido de cada progenitor. **Sin embargo, reitero, la controversia ante nuestra consideración no versa sobre filiación, sino que se reduce estrictamente al orden en que deben colocarse los apellidos en el nombre del hijo de los progenitores.**

A pesar de ello, una mayoría del Panel del Tribunal de Apelaciones **recurrió innecesariamente a una costumbre patriarcal que perpetua una visión machista y discriminatoria contra la mujer —e, igualmente, contra las personas del mismo sexo que reclaman ser ambas o ambos progenitores del inscrito—** para concluir que el certificado de nacimiento debía enmendarse con el propósito de que el apellido paterno primara sobre el materno.[20] **Ante el Derecho expuesto en este disenso, rechazo tajantemente esta conclusión**.

Ciertamente, a pesar de que en Puerto Rico no existe una ley que exija que los apellidos deben posicionarse de alguna manera específica, tradicionalmente se inscribe al nacido con el apellido paterno en primera posición, aunque ello no es obligatorio. Previo a continuar discutiendo los orígenes de esta costumbre, me parece acertado recordar las expresiones de este Tribunal en <u>Díaz González v. Tribunal Superior</u>, 102 DPR 195 (1974), al expresar que:

> **[N]o hace daño que cuando** el abogado o **el juez interpretan o aplican una institución importante del derecho estén conscientes de sus raíces y de su desenvolvimiento a través del tiempo**. Si eso es mucho pedir, por lo menos deben estar conscientes de que hay tales raíces y tal desarrollo; que no se

---

[20]Destaco que la Jueza del Tribunal de Apelaciones, Hon. Ana M. Mateu Meléndez, fundamentó correctamente su discrepancia con el proceder del resto del panel compuesto por el Juez Rodríguez Casillas, como ponente, el Juez Adames Soto y el Juez Marrero Guerrero. Véase, <u>Apéndice del certiorari</u>, <u>Opinión disidente</u> […], págs. 190-205.

trata de meras improvisaciones de ayer que existen por capricho.[21]

Adelanto que, al realizar tal ejercicio, **advierto que la inscripción en ese orden siempre ha obedecido a una costumbre que se identifica claramente por una línea férrea a través del tiempo: <u>la visibilización del hombre como la figura de poder en relación con la mujer progenitora</u>**.[22] Veamos.

**A.**

Según la Comisión Judicial Especial para estudiar el Discrimen por Género en los Tribunales de Puerto Rico (Comisión), entidad que realizó un <u>Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico</u> (Informe), el Derecho de Familia que heredamos de España se distinguió por establecer:

> [U]n matrimonio indisoluble, celebrado con la mayor solenmidad entre un hombre y una mujer, que aportaban, por imperativo legal, sus talentos, capacidad productora y resultados de sus esfuerzos a una empresa comunitaria, donde el marido actuaba, protegido por el manto de la ley, como único socio gestor de toda actividad económica y jurídica generada durante su vigencia. **Este reconocimiento exaltaba el papel protagónico del hombre, siempre dominante,** en el campo doméstico, social, político y

---

[21](Negrilla suplida). Íd., págs. 200-201.

[22]B. D. Rivera Burgos, <u>El orden de los apellidos en Puerto Rico</u>, 67 Rev. Jur. C. Abo. PR 29 (2006); Linacero de la Fuente, <u>op. cit.</u>, págs. 23, 113; A. Y. Saavedra Navarro, <u>El orden de los apellidos: ¿imposición o elección?</u>, págs. 15-17, https://pirhua.udep.edu.pe/bitstream/handle/11042/4923/DER 2102.pdf?sequence=1&isAllowed=y (última visita, 1 de mayo de 2023).

religioso. **La mujer debía total obediencia al marido, tenía que llevar su apellido y seguirle donde quiera que fijan su residencia**, someterse a la relación sexual, aunque fuese forzada, y cederle potestad exclusiva sobre sus hijos e hijas.[23]

En ese entonces, era el Art. 94 del Código Civil de 1930, 31 LPRA ant sec. 287, la fuente de Derecho que le imponía a la mujer casada la obligación de usar el apellido de su marido. Empero, en virtud de la Ley Núm. 93 de 9 de julio de 1985, este articulado se derogó,

> **[Y]a que es a todas luces contrario a nuestro ordenamiento constitucional el imponer a la mujer la obligación de usar el apellido de su marido, cuando a [e]ste no se le impone una obligación igual.**
>
> **Esta Asamblea Legislativa entiende como política pública que todo discrimen por razón de sexo que contenga nuestro ordenamiento jurídico, debe eliminarse.**
>
> Para cumplir con esta política pública y evitar que se considere a la mujer un ser inferior o independiente, debe derogarse este artículo.[24]

A pesar de lo anterior, la tradición de subordinar el apellido de la mujer no cesó. Tal costumbre continuó en el contexto de los progenitores al inscribir a sus hijos en

---

[23](Negrilla suplida). Comisión Judicial Especial para estudiar el Discrimen por Género en los Tribunales de Puerto Rico (Comisión), Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico, 1995, pág. 164 (citas internas omitidas).

[24](Negrilla y subrayado suplidos). Exposición de Motivos de la Ley Núm. 93 de 9 de julio de 1985 (1985 Leyes de Puerto Rico 321.

el Registro Demográfico. Al contextualizar esta práctica,

el Informe de la Comisión denuncia que:

> [E]l uso de los apellidos paternos como el patronímico que identifica a la familia, siendo esta costumbre, elevada a rango jurídico, [es] **la manifestación más obvia del dominio masculino en el seno familiar**. La ley no requiere que se coloque el apellido del padre antes del de la madre, pero nadie ha cuestionado esa ubicación, porque social y culturalmente siempre se ha aceptado que así se haga.[25]

Ahora bien, con la aprobación del Código Civil de 2020, finalmente se desaprobó la utilización de esta costumbre. Según surge del Código Civil de 2020 Comentado,[26] al promulgarse el Art. 83, supra,[27] la Asamblea Legislativa estuvo consciente de **"la inclusión del apellido paterno y el materno, en ese orden, por práctica administrativa, aunque no hay una norma escrita que así lo exija"**.[28]

---

[25]Informe de la Comisión, supra, pág. 205.

[26]La compilación de los comentarios por parte de la Asamblea Legislativa se realizó "con el fin de comparar y servir de guía en el proceso de análisis e investigación que generará esta nueva ley" y, a su vez, para hacer "más conveniente a las y los investigadores obtener una noción del racionamiento sobre el artículo que le interesa conocer". **Nótese que, de lo antes expuesto, nace la importancia de tales comentarios al analizar esta controversia.** Véase, https://www.oslpr.org/ files/ugd/5be21a 15cd7772b7ca4ecd84 035ed394e1e517.pdf, pág. 1 escolio 1 (última visita, 1 de mayo de 2023).

[27]"El nombre de una persona comprende el nombre propio o individual unido al primer apellido de sus progenitores". 31 LPRA sec. 5542.

[28](Negrilla suplida). Código Civil de 2020 Comentado, supra, pág. 75.

Así pues, tras reconocer esta costumbre, el Poder Legislativo realizó un recorrido normativo que, por su extrema pertinencia, expongo a continuación:

Como se afirma en el Estudio Preparatorio del Código Civil de Puerto Rico, pág. 243, "el concepto de apellido paterno como apellido familiar se acentuaba más cuando la mujer casada llevaba el apellido de su marido. Al derogarse el Artículo 94 del Código Civil de 1930, que disponía que la mujer usara el apellido del marido, la costumbre adoptada por muchas mujeres de llevar el apellido del marido con la preposición "de" o a través de la total sustitución del apellido propio como ocurre en la sociedad estadounidense y en muchas latinoamericanas, comenzó a desaparecer. Cada día más mujeres casadas conservan sus dos apellidos de soltera." **Ante el cambio social y jurídico, es propio cuestionarse si debe imponerse el orden tradicional en la inscripción de los apellidos, primero paterno y luego materno, o si ello refleja y perpetúa la dominación masculina sobre la mujer y la familia.**

**Varias convenciones internacionales favorecen el que se elimine toda connotación sexista en la asignación de nombres y apellidos a las personas**. Por ejemplo, el Artículo 16 de la Convención de Naciones Unidades de 18 de diciembre de 1979, recomienda que los Estados signatarios tomen las medidas necesarias para hacer desaparecer toda disposición sexista en el derecho del nombre; el Comité de Ministros del Consejo de Europa, desde 1978, en la Resolución 78/37 recomienda a los Estados miembros que hagan desaparecer toda discriminación entre el hombre y la mujer en el régimen jurídico del nombre.

**Incluso, el Tribunal Europeo de Derechos Humanos ha sancionado**, en la sentencia de 22 de febrero de 1994, en el caso Burghartz C. Suisse, **las discriminaciones sexistas en la elección de los apellidos.** A partir de estas apreciaciones, las que se incluyen en la

exposición de motivos de la Ley Núm. 40-1999, sobre inscripción del nombre y orden de los apellidos, **España permite que los progenitores escojan el orden en que quieren que los hijos e hijas lleven sus apellidos.** Dicha exposición de motivos aclara que la regulación existente en el Código Civil y en la Ley del Registro Civil en materia del orden de inscripción de los apellidos establecía, hasta el momento de su aprobación, la regla general de que, determinándose la filiación por los apellidos, el orden de éstos sería el paterno y materno, aunque se reconocía la posibilidad de modificar esta situación por el hijo, una vez alcanzara la mayoría de edad. **Sin embargo, siguiendo las recomendaciones de los acuerdos internacionales citados, considera más justo y menos discriminatorio para la mujer permitir que inicialmente puedan los padres de común acuerdo decidir el orden de los apellidos de sus hijos, cuya decisión para el primer hijo habrá de valer también para los hijos futuros de igual vínculo**. Ante el no ejercicio de esta opción, deberá regir lo dispuesto en la Ley, que es la preferencia por el apellido paterno. La Ley Núm. 40 enmienda el Artículo 109 del Código Civil Español para que recoja en su texto esta nueva normativa.

El Artículo 51 del Código de Québec, permite que el menor recién nacido reciba uno (1) o más nombres de pila y el apellido de familia de uno (1) u otro de los progenitores, en el orden que los progenitores quieran, aunque se impone el límite de dos (2) apellidos. Estos apellidos pueden formarse por combinaciones de los apellidos de los padres, en el orden que ellos dispongan. Artículo 52 del Código Civil de Québec. Incluso los hijos de un mismo matrimonio pueden llevar apellidos distintos, paterno unos, materno otros, o los dos (2) apellidos en diverso orden, según lo dispongan los padres. Se evita así la alegación de discrimen por razón del género de los padres. Los Artículos 50 a 70

del Código de Québec, regulan extensamente
el asunto del nombre.[29]

**De los comentarios legislativos antes citados se desprende el repudio institucional al costumbrismo de que sea el apellido del hombre el que tenga primacía sobre el de la mujer.[30]**

Puesto que el Tribunal de Apelaciones acudió a esta costumbre para resolver el caso de epígrafe, procedo a exponer —de conformidad con la prelación de las fuentes de Derecho que rigen en nuestro ordenamiento jurídico— los fundamentos constitucionales y estatutarios que demuestran la incorrección de este proceder.[31]

---

[29](Negrilla y subrayado suplidos). Íd., págs. 75-76.

[30]Tal limitación tampoco está contenida en el Art. 84 ("Si uno solo de los progenitores reconoce e inscribe a la persona nacida, lo hace con sus dos apellidos en el mismo orden del progenitor que lo reconoce. El reconocimiento posterior del otro progenitor justifica la sustitución de uno de los apellidos en el nombre de la persona por el del progenitor que le reconoce con posterioridad") o en el Art. 557 ("La filiación natural o la adoptiva determinarán los apellidos de la persona natural"). 31 LPRA secs. 5542, 7103.

[31]Tal prioridad responde a que:

Si la [Constitución o la] ley calla sobre el caso, no está clara o es insuficiente, no por eso el juez queda relevado de aquella su obligación primordial de fallar; en todo evento debe de dar su fallo; la imperfección técnica de la ley ha de ser suplida y salvada por el arte y la técnica del juez, poniendo a contribución los instrumentos de indagación de la voluntad legislativa que tenga a su alcance, y cuando el campo de la exploración legal esté agotado y no haya exactamente ley aplicable al caso, entonces la

**B.**

En la controversia aquí planteada el menor MMR fue inscrito en el Registro Demográfico con el apellido materno en primera posición. Ante la inconformidad del señor Cintrón Román, cabe preguntarse lo siguiente: **¿una vez se realizó tal inscripción, nuestro ordenamiento jurídico permite una modificación o alteración al certificado de nacimiento con el propósito exclusivo de conformarlo a la costumbre de que el apellido paterno debe tener prelación sobre el de la madre?** <u>Reitero que no</u>.

En primer lugar, adviértase que la costumbre en controversia representa una afrenta a los derechos fundamentales que garantizan la dignidad humana, la igualdad de las personas y la prohibición de discrimen por razón de sexo, así como las protecciones a la intimidad y contra ataques abusivos a la honra, a la reputación y a la vida privada o familiar. Art. II, Sec. 1 y 8, Const. PR, <u>supra</u>.

Debido a los orígenes en que tradicionalmente se ha fundamentado el relegar a un segundo plano el apellido materno, resulta incuestionable que esa costumbre no

_____

costumbre del lugar, y en su defecto los principios generales del Derecho, podrán suministrarle la solución y el fallo apetecidos.

F. Clemente de Diego y Gutiérrez, <u>Fuentes del Derecho Civil Español</u>, Madrid, Pub. Residencia de estudiantes, 1922, pág. 14. Véase, además, 31 LPRA sec. 5312.

sobrepasa el crisol constitucional estricto. Principalmente porque la tradición impugnada perpetúa un propósito que es inconstitucional, "pues busca reiterar un prejuicio que discrimina y disminuye el rol de la mujer en el ámbito familiar"[32] por razón de su sexo. Véase, Garib Bazaín v. Hosp. Aux. Mutuo et al., 204 DPR 601, 690, (2020) (citando a López v.  E.L.A., 165 DPR 280 (2005)). **En consecuencia, la invocación de la costumbre consagrada en el Art. 4 del Código Civil de 2020 es, a todas luces, un desatino considerable, sobre todo, porque tal tradición transgrede varias disposiciones de nuestro Derecho Constitucional estructural.**

En segundo lugar, no cabe duda de que la Ley del Registro Demográfico y el Código Civil de 2020 permiten la colocación del apellido materno en primer orden. Esta afirmación encuentra apoyo, particularmente, en la publicación realizada por la Asamblea Legislativa intitulada Código Civil Año 2020 Comentado, la cual incluye todos sus artículos con una explicación detallada sobre su procedencia.[33] Allí, como parte de una exposición sobre la

---

[32]Suprema Corte de Justicia de la Nación, Cuadernos de jurisprudencia núm. 7: Igualdad y no discriminación de género, México, pág. 61, https://www.sitios.scjn.gob.mx/cec/sites/default/files/publication/documents/2021-02/IGUALDAD%20Y%20NO%20DISCRIMINACION febrero%202021.pdf (última visita, 1 de mayo de 2023).

[33]Véase, escolio 28 de este Voto particular disidente.

intención legislativa y el alcance del Art. 82 del Código Civil de 2020, <u>supra</u>,[34] se expuso lo siguiente:

> Por otro lado, **el precepto propuesto mantiene la norma que exige la inscripción de los apellidos** paterno y materno, **<u>independientemente de su orden</u>**, por dos (2) razones: **<u>garantiza una más efectiva individualización de la persona en una sociedad muy poblada</u>, <u>y reconoce a la mujer y al hombre paridad de derechos respecto a los hijos e hijas que procrean juntos</u>**.[35]

Además, a igual conclusión arribó la profesora y ex jueza del Tribunal de Apelaciones, Migdalia Fraticelli Torres, quien, en el libro <u>El Código Civil de Puerto Rico de 2020: Primeras Impresiones</u>, concluyó lo siguiente:

> **Es decir, los artículos aludidos no requieren la colocación del apellido paterno antes del apellido materno. <u>Y no pueden requerirlo por varias razones</u>: <u>la primera</u>**, que el artículo 83 solo exige que la inscripción consista "del nombre propio o individual <u>unido al primer apellido de sus progenitores</u>". Sin imponer un orden; **<u>la segunda</u>**, que el artículo 84 permite que se

---

[34]Destáquese que esta normativa se inspiró en las siguientes fuentes:

> Procedencia: Código Civil de Puerto Rico de 1930, Artículos 118, 127 y 138; Ley Núm. 24 de 22 de abril de 1931, según enmendada, conocida como "Ley del Registro Demográfico de Puerto Rico", 24 L.P.R.A. sec. 1133, Artículo 19(3); Ley de Derechos de la Persona Menor de Edad, Artículo 6; en parte, Código Civil Español, Artículo 109; en términos generales, en otros códigos civiles extranjeros, particularmente los Artículos 51 y 52 del Código Civil de Québec y el Artículo 109 del Código Civil Español, según enmendado por la Ley Núm. 40-1999.

Código Civil de 2020 Comentado, <u>supra</u>, pág. 74.

[35](Negrilla y subrayado suplidos). Íd., pág. 76.

sustituya "uno de los apellidos… por el del progenitor que le reconoce con posteridad", sin indicar cómo o dónde se colocará el apellido añadido en la nueva inscripción, lo que implica que puede sustituirse y colocarse en cualquier orden; **la tercera**, que existe la posibilidad de que los dos progenitores que acudan a inscribir al nacido sean del mismo género. En esta situación, "el apellido paterno" no estará siempre o necesariamente disponible para colocarlo antes que el apellido del "otro progenitor".

La paternidad o la maternidad en los casos de parejas de un mismo género puede darse porque ambos progenitores adoptaron al inscrito, porque uno de ellos adoptó al hijo o la hija del otro, porque el inscrito es fruto de un acuerdo de maternidad subrogada o porque uno de los progenitores es mujer o transgénero que gestó a su propio hijo o hija en esa relación de pareja. No puede admitirse que las parejas del mismo género tengan la libertad de escoger el orden de los apellidos de su prole, pero las parejas heterosexuales no tengan esa opción.

Por lo dicho, **podemos afirmar que la normativa adoptada en el Código Civil de 2020 no impide la selección del orden de los apellidos del inscrito** en el Registro Civil por parte de sus progenitores, **situación que proscribe de nuestro ordenamiento el apellido paterno como patronímico familiar**. Esta novedad reafirma la igualdad de género como valor apremiante de nuestra sociedad, por lo que constituye un gran acierto de la reforma.[36]

Evidentemente, la validez de una inscripción con el apellido materno en primer orden en nuestro ordenamiento

_____

[36]M. Fraticelli Torres, op. cit., pág. 62.

jurídico es incuestionable.[37] Lo anterior cobra mayor vigencia al considerar que, en el caso específico de aquella "legislación cuyo fin primordial es remediar los efectos adversos de una actuación inconstitucional, **debemos favorecer una interpretación que resulte en una mejor protección de los derechos humanos. Debemos siempre tener presente que todas las leyes de justicia social 'deben ser liberalmente interpretadas, a fin de poder lograr los elevados fines perseguidos por el legislador'"**. (Negrilla suplida). <u>Noriega v. Gobernador</u>, 122 DPR 650, 681 (1988) (citando a <u>García Pagán v. Shiley Caribbean etc.</u>, 122 DPR 193, 209 (1988). Véase <u>Torres v. González</u>, 63 DPR 964, 972 (1944)). **<u>Por este otro argumento, resulta errado concluir que procede una enmienda al certificado de nacimiento con el fin de subordinar el apellido materno</u>**.

En tercer lugar, conviene repasar que, aún si ignoráramos que la costumbre cobra vigencia en ausencia de disposición legal aplicable, reitero que su validez está condicionada a que esta no sea contraria a la moral o el orden público. 31 LPRA sec. 5314. Sobre el particular, destaco que la tradición de imponer el apellido paterno

---

[37]Sobre el particular, téngase en consideración el Art 19 ("Cuando la ley es clara y libre de toda ambigüedad, su texto no debe menospreciarse bajo el pretexto de cumplir su espíritu") y el Art. 20 ("Para descubrir el verdadero sentido de una ley cuando sus expresiones son ambiguas, se considerará su razón y su espíritu, mediante la atención a los objetivos del legislador, a la causa o el motivo para dictarla") del Código Civil de 2020, <u>supra</u>. 31 LPRA secs. 5341-5342.

sobre el materno se clasifica como una costumbre <u>contra</u> <u>legem</u>, ya que, como vimos, es contraria a las diversas garantías constitucionales y estatutarias antes discutidas.

En ese sentido, la subordinación del apellido materno transgrede el orden público en la medida en que propicia unos valores patriarcales que no deben guiar la existencia y bienestar de la sociedad puertorriqueña.[38] <u>Pérez Rodríguez</u> <u>v. López Rodríguez</u>, supra. Por su parte, tal costumbre contraviene, además, los principios morales generalmente admitidos que propenden al respeto y garantizan la igualdad de los valores humanos. Véase, <u>Negrón v. Sucn. Izquierdo</u>, supra; <u>Flores v. Municipio de Caguas</u>, supra; <u>C.R.U.V. v.</u> <u>Peña Ubiles</u>, supra. **De ahí, además, que la imposición del apellido paterno como patronímico de la familia, fundamentado en la costumbre administrativa del Registro Demográfico, es insostenible.**

Por si fuera poco, ni siquiera en la Ley del Registro Demográfico o en el Código Civil de 2020 se establece expresamente que el apellido paterno debe inscribirse primero que el materno. Ante esa realidad, cobran aún mayor vigencia los pronunciamientos recientes de este Tribunal en <u>RPR & BJJ Ex Parte</u>, 207 DPR 389 (2021), a saber:

> No existe duda de que la información que consta en el Registro Demográfico

---

[38]Ello, sobre todo, ya que el orden público debe resguardarse con mayor preeminencia cuando se trata de derechos fundamentales que inciden en el bienestar general y son de alta jerarquía en la sociedad. <u>Martínez Marrero v.</u> <u>González Droz</u>, 180 DPR 579, 589 (2011).

constituye evidencia <u>prima facie</u> del hecho que se pretende constatar. **Tampoco hay duda de que** al Registro Demográfico solo tienen acceso los hechos o las cualidades del estado civil expresamente declarados inscribibles en la legislación registral y que **cualquier enmienda sustancial de sus constancias tiene que estar previamente autorizada por la ley y ordenada judicialmente**.[39]

En observancia de esos pronunciamientos, la disidencia en el Tribunal de Apelaciones, expresó correctamente que:

[N]uestro Tribunal Supremo ante un asunto novel no regulado, **ni prohibido**, ejerció su función e interpretó las disposiciones legales existentes resolviendo que, si un menor nacido por procreación asistida carece de filiación conocida paterna o materna, o de ambas, la la ostentaría el varón, mujer o pareja que lo reconozca, al margen de si el reconocido es o no hijo biológico del reconocedor.[40]

Es decir, aun cuando se pretendan ignorar los importantes aspectos constitucionales que enmarcan esta controversia, tal ejercicio interpretativo también obvia adrede que la enmienda al certificado de nacimiento validada por el Tribunal de Apelaciones no está autorizada por la ley. Sencillamente, tales omisiones son contrarias a la jurisprudencia emitida recientemente por este Tribunal.

En definitiva, la antinomia entre una costumbre y las disposiciones de las Constituciones local y federal, así

---

[39](Negrilla y subrayado suplidos). Íd., págs. 434-435.

[40](Negrilla suplida). Véase, <u>Apéndice del certiorari, Opinión disidente de la Hon. Jueza Mateu Meléndez</u>, pág. 203.

como del Código Civil de 2020 y los preceptos que lo inspiraron, tienen el efecto de que tal costumbre carezca de valor vinculatorio. ¿O es que, acaso, los tribunales deben permitirle a una costumbre lo que si fuese establecido mediante ley sería declarado inconstitucional? **A ello, contesto que no dado que la costumbre, por su propia razón de ser, está impedida de quebrantar aquellas fuentes normativas de mayor jerarquía.**

Adviértase que el desarrollo de esta corriente en el Derecho comparado apunta a la misma dirección. Veamos.

**C.**

A modo de ejemplo, la Suprema Corte de Justicia de México atendió una controversia sobre la solicitud de unos padres para que sus hijas fuesen inscritas con los apellidos de la madre y el padre, en ese orden. En su análisis, tal foro determinó que privilegiar el apellido paterno "persigue mantener concepciones y prácticas discriminatorias en contra de la mujer", lo que es contrario al derecho constitucional a la igualdad.[41] Particularmente, la Corte señaló que:

> [e]l reconocimiento constitucional de este
> derecho tuvo como objetivo reafirmar el

---

[41]Véase, Cuaderno de jurisprudencia núm. 7: Igualdad y no discriminación de género, https://www.sitios.scjn.gob.mx/cec/sites/default/files/publication/documents/2021-02/IGUALDAD%20Y%20NO%20DISCRIMINACION_febrero%202021.pdf, pág. 61 (haciendo referencia a SCJN, Primera Sala, Amparo en Revisión 208/2016, 19 de octubre de 2016) (última visita, 1 de mayo de 2023).

> igual valor y dignidad de la mujer con respecto al hombre, por lo que [e]sta tiene derecho a intervenir en condiciones de equidad en todas las relaciones sociales, laborales y familiares que participe. Así, ni los roles, costumbres o prejuicios deben servir de pretexto para negarle el ejercicio de algún derecho. Todo lo contrario, el derecho a la igualdad impone que se adopten medidas apropiadas para eliminar los estereotipos y prácticas atingentes a los papeles de hombres y mujeres, que surgen de modelos de inferioridad de un sexo respecto a otro, o bien de las funciones de género, las cuales no nece- sariamente están definidas por el sexo.[42]

Fundamentado en lo anterior, la Suprema Corte ordenó que se emitieran las actas de nacimiento de las menores según fueron solicitadas por los padres.

Por otro lado, en Perú, el Tribunal Constitucional se confrontó con la negativa del registro a inscribir los apellidos de una menor debido a la interpretación tradicional de la disposición que regulaba el orden de los apellidos. Ante esto, ese Tribunal precisó que tal disposición no podía evaluarse en abstracción del ejercicio y goce de una multiplicidad de derechos fundamentales que se ven afectados por tal imposición. En reconocimiento de ello, el Tribunal Constitucional interpretó el articulado "en concordancia con los valores y principios constitucionales, en mérito a que no haya un orden de

---

[42] Íd.

prelación entre el apellido paterno y materno, para que sean los padres quiénes decidan".[43]

Asimismo, la Corte Constitucional de Alemania declaró inconstitucional un estatuto que disponía que el apellido del marido constituía el apellido familiar. El fundamento principal utilizado se circunscribió a que tal disposición violaba el principio de igualdad entre el hombre y la mujer.[44]

Como vemos, la jurisprudencia internacional examinada, unida al Derecho Internacional reconocido por la Asamblea Legislativa de Puerto Rico, demuestra una tendencia incuestionable de rechazo a la costumbre como fundamento para resolver esta controversia.[45]

---

[43]R. Díaz Giunta, F. Vásquez Robles, Caso de orden de apellidos: una interpretación auténticamente constitucional del Código Civil Peruano, https://www.researchgate.net/publication/366999464_Caso_de_orden_de_apellidos_una_interpretacion_autenticamente_cons titucional_del_Codigo_Civil_peruano/fulltext/63bd9fe603aad 5368e7da7f3/Caso-de-orden-de-apellidos-una-interpretacion-autenticamente-constitucional-del-Codigo-Civil-peruano.pdf, pág. 17 (última visita, 1 de mayo de 2023).

[44]M. V. Famá, M. Herrera, La perspectiva de género en el derecho de familia o cómo el derecho de familia silencia al género, 41 Rev. Jur. UIPR 345, 366 (2007) (citando a BGB, art. 1355. Jaime Eric, Cognome e Diritto di Famiglia Nella Recente Reforma Tedesca (con spunti di diritto comparato), Revista di diritto Civile, parte 2, 71 et. seq. (1995)).

[45]Véase, Saavedra Navarro, supra, págs. 33,41-43 (haciéndose referencia a lo resuelto por el **Tribunal Supremo de España**, Sala de lo Civil, Acción de filiación, Sentencia de casación Núm. 4839) y (reseñándose lo determinado por el **Tribunal Europeo de Derechos Humanos** al momento de emitir

**D.**

Por tanto, ante una **costumbre inválida por su propia razón de ser**,[46] procedía que atendiéramos este asunto de conformidad con los principios de Derecho que rigen en nuestro ordenamiento jurídico.[47]

En ese sentido, es harto conocido que la falta de acuerdo entre los progenitores con respecto a sus hijos consecuentemente ha sido resuelta por los tribunales de acuerdo con el principio doctrinal del "mejor interés" o el "mejor bienestar" del menor. Este criterio, reafirmado en el Código Civil de 2020 bajo el concepto del "interés óptimo" rige en casi todas las disposiciones legales que involucran a menores.[48] De hecho, este estándar ha sido

---

Sentencia en el caso <u>Burghartz vs. Switzerland</u>, sentencia de 22 de febrero de 1994).

[46]Para una discusión en torno a la improcedencia de utilizar una costumbre patriarcal que no se ajusta a los reconocimientos actuales en el Derecho de Familia, véase, M. Atienza, <u>Un caso no tan difícil</u>, <u>https://www.academiajurisprudenciapr.org/un-caso-no-tan-dificil/</u> (última visita, 1 de mayo de 2023).

[47]Véase, 31 LPRA 5312.

[48]En ese sentido, el principio del "interés óptimo" es el criterio rector en todos aquellas controversias en las que haya que: (1) determinar el domicilio del menor, ante el desacuerdo de los progenitores separados; (2) escoger y designar un tutor; (3) al emitir las medidas provisionales que le afectan en el divorcio de los progenitores; (4) autorizar su adopción; (5) conceder la custodia compartida; autorizar el derecho de visita de otros parientes; (6) administra[r] sus bienes por los progenitores con patria potestad; (7) decretar judicialmente su emancipación, entre otros actos que le afectan. Fraticelli Torres, <u>op. cit.,</u>

utilizado por una multiplicidad de jurisdicciones al enfrentarse a controversias relacionadas con el cambio de apellido de un menor.[49]

**Desde el 1980,** la Corte Suprema de California resolvió que debía de abolirse la costumbre que otorgaba al padre, en lugar de a la madre, un derecho primario a que su hijo lleve su apellido. In re Marriage of Schiffman, 620 P.2d 579, 583 (1980). Por ello, estableció que el criterio rector cuando los progenitores disputan uno de los apellidos con los que su hijo fue inscrito es aquel que sirva el mejor interés del menor. ("We conclude that the rule giving the father, as against the mother, a primary right to have his child bear his surname should be abolished. Henceforth, as in parental custody disputes, the sole consideration when

---

pág. 99 (haciendo referencia a 31 LPRA secs. 5554, 5681-5682, 6793, 7187, 7282, 7332, 7631-7632, 7453, 7455).

[49]Al respecto, en Roe v. Conn, 417 F. Supp. 769 (M.D. Ala. 1976), la Corte resolvió lo siguiente:

> This Court concludes that there is no rational basis for the state's policy of giving to the declared father complete control over the child's name. For this reason, we find that Title 27, s 12 violates the equal protection clause of the Fourteenth Amendment. In changing a child's name pursuant to a declaration of father, the State should be directed not by the desires of the father but by the best interest of the child.

(Negrilla suplida). Íd, pág. 783.

parents contest a surname should be the child's best interest."). Íd.[50]

Años más tarde, **en el 1995,** la Corte Suprema de New Jersey atendió una controversia instada por un padre que deseaba cambiar el apellido con el que la madre de su hijo lo inscribió. Gubernat v. Deremer, 657 A.2d 856 (1995). Tras analizar los orígenes patriarcales que condujeron a la costumbre que presupone la subordinación del apellido materno, así como los cambios acaecidos que reafirman la igualdad humana, concluyó que el principio que debe guiar a los tribunales es el mejor interés del niño **sin nociones basadas en el género de los padres.** Íd., pág. 867. **Acto**

---

[50]Luego, **en el 1988,** la Corte Suprema de Rhode Island adoptó el criterio del "mejor interés" en una controversia relacionada con el cambio de apellidos de un menor. Específicamente, en Ribeiro v. Monahan, 524 A.2d 586 (R. I 1987), se concluyó lo siguiente:

> The traditional view at common law was that a child bore the surname of his or her father. We see no necessity for giving an extensive historical review of the changes that have occurred in women's status since the days of common law by the enactment of such measures as the Married Women's Act, the statutory prohibition of wage differentials based on sex, or no-fault divorce legislation. It is our belief that today the basis for the patrimonial control of surnames has practically disappeared. The standard to be employed in surname disputes was well stated in the Schiffman case, where the court observed, "The sole consideration when parents contest a surname should be the child's best interest."

Íd., pág. 587. (Citas internas omitidas).

**seguido, la Corte expuso una serie de criterios que distintos tribunales han considerado al determinar cuál de los apellidos serviría los mejores intereses del menor, entre estos, los siguientes: (1)** el tiempo que el niño ha utilizado el apellido con el que fue inscrito; **(2)** la identificación del niño como miembro de una familia en particular; **(3)** la potencial ansiedad, vergüenza o incomodidad que el niño pudiese experimentar si lleva un apellido diferente al del progenitor custodio, **(4)** y cualquier preferencia que el niño pueda expresar, en caso de que el niño posea madurez suficiente para expresar una preferencia relevante. ("Courts applying the best-interests-of-the-child standard consider a number of criteria determining the advantages and detriments to a child of assuming either the maternal or paternal surname. Those factors include the length of time that the child has used one surname, the identification of the child as a member or part of a family unit, the potential anxiety, embarrassment, or discomfort the child might experience if the child bears a surname different from the custodial parent, and any preferences the child might express, assuming the child possesses sufficient maturity to express a relevant preference.").[51]

---

[51]Íd, págs. 867-868 (citando a M.D. v. A.S.L., supra, 275 N.J.Super. at 535, 646 A.2d 543; In re Schiffman, supra, 169 Cal.Rptr. at 922, 620 P.2d at 583; Cohee v. Cohee, 210 Neb. 855, 317 N.W.2d 381, 384

Posteriormente, **en el 2013**, la Corte Suprema de New Jersey apuntaló en Emma v. Evans, 71 A.3d 862 (2013), que, dada la importancia del nombre otorgado a un hijo, la decisión de alterar su nombre conlleva un momento significativo en su vida. Íd., pág. 872. Luego de reiterar los factores expuestos en Gubernat v. Deremer, supra, **la Corte detalló ciertos factores adicionales que, a la luz de la totalidad de las circunstancias, deben ser considerados al determinar si el mejor interés del menor está servido en, por una parte, la retención del apellido con el que fue inscrito o, por otra, en el cambio de apellido solicitado, a saber: (5)** mala conducta o negligencia de los progenitores, como lo sería la falta de apoyo o de contacto con el niño; **(6)** grado de respeto comunitario, o la falta de él, asociado con el nombre paterno o materno; **(7)** motivación indebida por el progenitor que solicita el cambio de apellido; **(8)** si el progenitor ha cambiado o tiene la intención de cambiar su nombre al contraer matrimonio; **(9)** si el niño tiene una relación sólida con hermanos de diferentes apellidos; **(10)** si el apellido tiene vínculos importantes con el patrimonio familiar o la identidad étnica, y **(11)** el efecto de un cambio de nombre en la relación entre el hijo y cada uno de los progenitores. ("Moreover, courts may also consider

---

(1982); Bobo, supra, 528 N.E.2d at 185; In re Richie, 387 Pa.Super. 401, 564 A.2d 239, 241 (1989)).

such additional factors as the following, some of which had been identified by the Gubernat Court as factors to be used in rebutting the custodial parent presumption, but which now should be considered as part of the gender-neutral and child-centered totality-of-the-circumstances analysis of the child's interest in retaining or having altered his or her given surname: 5. Parental misconduct or neglect, such as failure to provide support or maintain contact with the child[;] 6. Degree of community respect, or lack thereof, associated with either paternal or maternal name[;] 7. Improper motivation on the part of the parent seeking the name change[;] 8. Whether the mother has changed or intends to change her name upon remarriage[;] 9. Whether the child has a strong relationship with any siblings with different names[;] 10. Whether the surname has important ties to family heritage or ethnic identity[;] 11. The effect of a name change on the relationship between the child and each parent."). Íd., pág. 877.

Como vemos, nuestro ordenamiento jurídico, así como una amplia gama de jurisdicciones, contemplan el interés óptimo del menor como el criterio judicial a ser considerado en aquellas instancias en las que los progenitores están en desacuerdo con respecto al orden en que deben constar los apellidos del menor.

**Empero, hoy, <u>en el 2023</u>, al este Tribunal declinar atender en los méritos esta controversia, convalida un dictamen erróneo que falló en contextualizar las implicaciones históricas, sociales y culturales de la nueva corriente doctrinal, garante de derechos constitucionales, introducida a nuestro marco legal en virtud del Código Civil de 2020. Por tanto, se perpetúa una tradición plagada de consideraciones vetustas que, bajo el pretexto del costumbrismo, descalabra una multiplicidad de derechos fundamentales consagrados en la Constitución de Puerto Rico y en la de Estados Unidos.**

V

Históricamente, la jurisprudencia más relevante y emblemática del Tribunal Supremo federal se ha dirigido, precisamente, a erradicar "costumbres" contrarias a postulados constitucionales. Lamentablemente, el Tribunal Supremo de Puerto Rico pierde hoy, nuevamente, otra oportunidad para dar un paso histórico que erradique los efectos lesivos de una "costumbre" contraria a los postulados constitucionales discutidos en este <u>Voto particular disidente</u>. Toda vez que no se optó por desterrar permanentemente de nuestro ordenamiento jurídico los vestigios discriminatorios de una costumbre obsoleta y

machista, opuesta a nuestras fuentes de Derecho y que promueve la desigualdad, **disiento**.


                                    Luis F. Estrella Martínez
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Anthony Cintrón Román | | |
|---|---|---|
| Recurrido | | |
| v. | CC-2023-0049 | *Certiorari* |
| Charline Michelle Jiménez Echevarría por sí y en representación del menor MMRJR y de la Sociedad Legal de Gananciales por ellas compuesta, Ruth N. Rodríguez Ocasio por sí y en representación de la Sociedad Legal de Gananciales por ellas compuesta y el menor MMRJR | | |
| Peticionaria | | |

Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 2 de mayo de 2023.

> "Se trata [aquí] de […] una situación que no pu[do] haber sido regulada por ninguna costumbre, debido a su carácter estrictamente novedoso".[1]

Hoy, ante una oportunidad única de desterrar de nuestro ordenamiento jurídico otro terrible vestigio del discrimen del que muchas veces es víctima la mujer en el País, este Tribunal decide guardar silencio. Al así hacerlo, en pleno Siglo XXI, y al amparo de la anquilosada doctrina del uso y la costumbre, se valida una visión totalmente patriarcal, -- según expuesta en una conceptual y jurídicamente errada

---

[1] M. Atienza, *Un caso no tan difícil*, XXIII Rev. Acad. PR Juris. & Legis. 97, 100 (2023); artículo de revista jurídica donde, precisamente, el prestigioso jurista y filósofo español Manuel Atienza comenta a fondo los dictámenes emitidos por el foro primario y apelativo intermedio en la causa de epígrafe que hoy son objeto de revisión por este Tribunal.

*Sentencia* del Tribunal de Apelaciones[2] -- la cual exige que, en caso de desacuerdo entre los progenitores sobre el orden en que han de transmitir sus respectivos apellidos a sus hijos o hijas una vez establecida la doble filiación --, el Registro Demográfico se vea en la obligación de inscribir primero el apellido paterno, y luego el apellido materno. Disentimos.

Al así hacerlo, hacemos nuestra aquella máxima que postula que el derecho, como las sociedades, evoluciona. En esta ocasión, le tocaba, pues, a este Tribunal darle sentido al anterior postulado.

Lamentablemente, la actitud pasiva de algunos de mis compañeros y compañera de estrado no lo permitió. Lo anterior, es solo un reflejo más de lo mucho que, como sociedad, nos queda por hacer.

Así pues, al este Tribunal decidir no actuar sobre los noveles asuntos que hoy se traen ante nuestra atención, procedemos -- desde la disidencia; sí, esa conversación con un tiempo futuro[3] -- a exponer lo que, a nuestro juicio, era la forma más justa de disponer de éstos. Veamos.

I.

Los hechos medulares que dan margen al presente litigio no están en controversia. Allá para el 8 de junio de 2021, el Sr. Anthony Cintrón Román (en adelante, "señor Cintrón

---

[2] El referido dictamen del foro apelativo intermedio fue avalado por los Jueces de Apelaciones Rodríguez Casillas, Adames Soto y Marrero Guerrero. La Jueza de Apelaciones Mateu Meléndez disintió.

[3] Cita que se le atribuye a la pasada Jueza Asociada del Tribunal Supremo de los Estados Unidos, Hon. Ruth Bader Ginsburg.

Román") instó ante el Tribunal de Primera Instancia cierta *Demanda* sobre impugnación de maternidad y filiación en contra de la Sra. Charline M. Jiménez Echevarría (en adelante, "señora Jiménez Echevarría"), la Sra. Ruth Noelia Rodríguez Ocasio (en adelante, "señora Rodríguez Ocasio"), la sociedad legal de gananciales compuesta por ambas y el menor MMRJR (en adelante, "MMR").

En ésta, el señor Cintrón Román indicó que para abril de 2021 la señora Jiménez Echevarría dio a luz al menor MMR, el cual fue inscrito en el Registro Demográfico de Puerto Rico (en adelante, "Registro Demográfico") como hijo de ésta última y de la señora Rodríguez Ocasio (en conjunto, "matrimonio Jiménez Rodríguez"). En ese contexto, alegó que era el padre biológico del menor MMR, por lo que impugnó la maternidad de la señora Rodríguez Ocasio. En esa línea, el señor Cintrón Román solicitó que, una vez establecida la filiación paterna, se rectificase la inscripción registral para que el menor MMR ostentara el apellido paterno.

En respuesta, el matrimonio Jiménez Rodríguez presentó su *Contestación a demanda y reconvención*. En esencia, sostuvo la validez de la inscripción del menor MMR como hijo de ambas. En la alternativa, y de decretarse la filiación paterna, el matrimonio Jiménez Rodríguez solicitó que se le concediera la custodia del menor MMR a la señora Jiménez Echevarría -- entiéndase, a la madre biológica de éste --; que se le impusiera al señor Cintrón Román el pago de una pensión alimentaria a favor del menor MMR, y que se mantuviese como

primer apellido del menor el que se le impuso al nacer, entiéndase, -- Jiménez -- el apellido de su madre biológica.

Recibida la contestación a su demanda y la correspondiente reconvención, el señor Cintrón Román presentó su contestación a ésta última. En síntesis, entre otras cosas, reclamó la custodia compartida del menor MMR y se opuso a lo solicitado por el matrimonio Jiménez Rodríguez respecto a mantener como primer apellido del menor el de su madre biológica. Por el contrario, el señor Cintrón Román solicitó que, una vez se estableciera la filiación, se modificara el primer apellido del menor MMR por el apellido paterno.

Así las cosas, y luego de varios trámites procesales no necesarios aquí pormenorizar, -- entre ellos, la designación de una defensora judicial para el menor MMR --, el matrimonio Jiménez Rodríguez presentó una *Moción informativa sobre asuntos sobre los cuales la parte demandada se allana y asuntos sobre los que existe controversia*. En ésta, el referido matrimonio -- tras la prueba de histocompatibilidad arrojar un 99.99% de compatibilidad --, consintió a que se rectificase la inscripción registral para que la señora Jiménez Echevarría y el señor Cintrón Román constaran como madre y padre del menor MMR respectivamente.

No obstante, y en lo aquí pertinente, el matrimonio Jiménez Rodríguez expresó que aun existía controversia respecto al orden en que debían asignarse los apellidos al menor MMR, una vez se determinara la filiación paterna. A esos fines, el mencionado matrimonio reiteró que el menor MMR

debía conservar como primer apellido el materno -- Jiménez --, entiéndase, aquel con el que se le había identificado desde la inscripción de su nacimiento en el Registro Demográfico.

El señor Cintrón Román, oportunamente, se opuso al petitorio del matrimonio Jiménez Rodríguez respecto al orden de atribución de los apellidos. En ese sentido, el señor Cintrón Román, amparado en la doctrina del uso y la costumbre, insistió en que, establecida la paternidad, debía anteponerse el apellido paterno al materno.

Así pues, evaluados los escritos de ambas partes, el 15 de junio de 2022 el Tribunal de Primera Instancia emitió una *Sentencia* mediante la cual declaró con lugar la demanda sobre impugnación de maternidad y filiación presentada por el señor Cintrón Román.[4] En consecuencia, el foro primario le requirió al Registro Demográfico rectificar la inscripción registral para que la señora Jiménez Echevarría y el señor Cintrón Román figurasen como madre y padre del menor MMR.

**Ahora bien, en cuanto al orden en que debían imponerse los apellidos al menor MMR, el Tribunal de Primera Instancia ordenó que se mantuviese como primer apellido el materno y que se sustituyera el segundo apellido con el que fue inscrito el menor al nacer -- entiéndase, Rodríguez -- por el apellido paterno. De ahí que, "el nombre del menor [constase como MMR] Jiménez Cintrón".** Apéndice del *certiorari*, pág. 30.

---

[4] En esa misma fecha, el Tribunal de Primera Instancia notificó una *Sentencia enmendada nunc pro tunc* en la que corrigió únicamente el número del caso. Apéndice del *certiorari*, págs. 32-34.

En desacuerdo con parte de lo sentenciado por el foro primario, el señor Cintrón Román presentó una *Solicitud de reconsideración*. En ésta, impugnó la determinación del Tribunal de Primera Instancia únicamente en lo relacionado a la atribución del orden de los apellidos. En esencia, señaló que, ante la ausencia de un estatuto que estableciera el orden en que debían constar los apellidos del menor una vez se estableciera la filiación paterna, procedía acudir a la doctrina del uso y la costumbre, la cual favorece la imposición del apellido paterno frente al materno.

Enterada de lo anterior, la señora Jiménez Echevarría, se opuso al petitorio del señor Cintrón Román. A esos fines, alegó que acudir a la doctrina del uso y la costumbre para sustentar la imposición del apellido paterno previo al materno supondría una vulneración al principio de igualdad y de la prohibición de discriminación por razón de sexo.

Evaluados ambos escritos, el foro primario emitió una *Resolución* mediante la cual denegó la solicitud de reconsideración presentada por el señor Cintrón Román. La referida *Resolución* fue notificada a todas las partes con interés en el litigio.

Inconforme aún con el proceder del Tribunal de Primera Instancia, el señor Cintrón Román acudió al Tribunal de Apelaciones mediante recurso de apelación. En esencia, argumentó que el foro primario había errado al mantener como primer apellido del menor MMR el apellido materno. Lo

anterior, a su modo de ver, en abstracción del uso y la costumbre imperante en el País.

A dicha solicitud, el matrimonio Jiménez Rodríguez se opuso. En su escrito ante el foro apelativo intermedio, el referido matrimonio esbozó planteamientos similares a los expuestos ante el Tribunal de Primera Instancia.

**Tras analizar los alegatos de ambas partes, el Tribunal de Apelaciones emitió una *Sentencia* mediante la cual revocó la determinación del foro primario respecto a la imposición del orden de los apellidos del menor MMR. Al así hacerlo, ordenó que se inscribiera "al menor MMR con el apellido del padre y la madre, en ese orden".** Apéndice del *certiorari*, pág. 181.

**De forma específica, el foro apelativo intermedio -- ante la ausencia de un estatuto que regulara el orden en que debían inscribirse los apellidos del menor de edad en caso de desacuerdo entre sus progenitores --, aludió a la doctrina del uso y la costumbre para sustentar la inscripción del apellido paterno en primer orden y el materno en segundo orden. Si bien el Tribunal de Apelaciones reconoció que dicha "costumbre se hilvanó dentro de unos preceptos de una sociedad patriarcal", concluyó que la misma no era contraria a la moral o al orden público.** (Énfasis suplido). Apéndice del *certiorari*, págs. 180-181.

En desacuerdo con lo dictaminado por el foro apelativo intermedio, el matrimonio Jiménez Rodríguez recurrió ante este Tribunal mediante el presente recurso de *certiorari*. En

resumen, señala que el Tribunal de Apelaciones erró al rehusarse a atemperar los estatutos que gobiernan la controversia que nos ocupa a las nuevas realidades de la institución familiar. Así como, al concluir que, de no existir acuerdo entre los progenitores, conforme a la doctrina del uso y la costumbre, el apellido paterno tiene prelación sobre el materno.

En particular, el referido matrimonio argumenta que la determinación del foro apelativo intermedio vulnera, entre otros, el derecho a la no discriminación por razón de sexo; motivo por el cual entiende que, previo a disponer del caso de autos y aplicar la costumbre como fuente de derecho, el Tribunal de Apelaciones debió realizar un análisis constitucional. Tarea que el foro apelativo intermedio no emprendió.

Evaluada la referida petición, este Tribunal -- lamentablemente -- declaró *no ha lugar* el mencionado recurso de *certiorari* y, en consecuencia, se confirma el conceptual y jurídicamente errado dictamen emitido por el Tribunal de Apelaciones que aplica una norma consuetudinaria -- claramente inaplicable en el caso de autos -- para sustentar la prelación del apellido paterno sobre el materno en la inscripción de los apellidos de cierto menor de edad, una vez se establece la filiación paterna. Como ya adelantamos, del proceder seguido en el día de hoy por esta Curia, enérgicamente disentimos. Nos explicamos.

II.

A.

Como es sabido, la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, en el Art. II, Sec. 1, establece que "[l]a dignidad del ser humano es inviolable". Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1, pág. 275. Asimismo, enlazado con ese derecho, nuestra Carta Magna, en su Art. II, Sec. 8, dispone que "toda persona tiene derecho a la protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Const. ELA, *supra*, pág. 324.

De este modo, se codifica en la Constitución de nuestro País el derecho fundamental a la intimidad, el cual incluye la libertad de toda persona a tomar decisiones sobre su vida, libre de intervenciones extrínsecas. R. Cox Alomar, *The Puerto Rico Constitution*, New York, Oxford, 2023, pág. 81. Véase, además, *Vigoreaux Lorenzana v. Quizno's*, 173 DPR 254, 262 (2008). El mencionado derecho, el cual opera *ex proprio vigore*, le prohíbe al Estado, y a toda persona, inmiscuirse en la vida privada o familiar de los demás seres humanos. J.M. Farinacci Fernós, *La Carta de Derechos*, 1ra ed., San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021, pág. 149. Véase, también, *Lozada Tirado et al. v. Testigos Jehová*, 177

DPR 893, 910 (2010); *López v. ELA*, 165 DPR 280, 294 (2005); *Colón v. Romero Barceló*, 112 DPR 573, 576 (1982).[5]

Consecuentemente, al evaluar el alcance de la antes mencionadas clausulas constitucionales, hemos sentenciado que el derecho a la intimidad se lesiona, "entre otras instancias, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas". *Lozada Tirado et al. v. Testigos Jehová*, *supra*, págs. 910-911. Ello,

---

[5] Si bien somos conscientes, como acabamos de señalar, que en las controversias que originan el presente litigio subyacen planteamientos relacionados con el derecho a la intimidad, insistimos, tal como lo hemos hecho en el pasado, que casos como estos también nos permitirían extender al ámbito de las relaciones privadas la protección constitucional a la dignidad humana. **Esta vez, como un derecho independiente**.

Al respecto, nos comenta el profesor Carlos Ramos González que la dignidad humana "pertenece a una misma especie donde cada uno de nosotros [y nosotras] la sostiene sin que pueda entregarse, renunciarse o negociarse sin afectar a los demás". C. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho constitucional puertorriqueño*, Vol. X, Rev. Acad. Puer. de Juris. y Leg., 1 (2010). Ésta última, es un valor inherente a la condición de ser persona que contempla el respeto y trato adecuado que merece cada individuo. Farinacci Fernós, *op. cit.*, pág. 29.

Específicamente, se desprende del Art. II, Sec. 1, de nuestra Constitución, *supra*, así como de la discusión habida entre los delegados de la Convención Constituyente, que el derecho a la inviolabilidad de la dignidad humana se incorporó con un propósito dual. *Íd.*, pág. 31. **En primer lugar, para que fuese reconocido como fuente independiente de derecho con su propio contenido normativo.** *Íd.* En segundo lugar, para posicionarlo como la arquitectura ideológica de nuestra Carta de Derechos, ya que "[t]al vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable". 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, págs. 1103 (ed. 1961); citado en Farinacci Fernós, *op. cit.*, pág. 31.

**Sin embargo, y muy a pesar de lo anterior, esta Curia no ha dilucidado el potencial de la inviolabilidad de la dignidad humana como un derecho independiente.** Ramos González, *supra*; J.J. Álvarez González, *Contestación al discurso del profesor Carlos E. Ramos González*, Vol. X, Rev. Acad. Puer. de Juris. y Leg., 31-45 (2010). Por el contrario, la ha reducido a un derecho complementario de otros derechos fundamentales y tiende a aplicar en su lugar -- en ocasiones, forzadamente -- el derecho a la intimidad. *Íd.* Con esto, hemos relegado la oportunidad de desarrollar y aplicar en nuestra jurisdicción el derecho autóctono a la dignidad humana como un derecho independiente, abarcador, irrenunciable, no canjeable, que opere *ex propio vigore* y oponible ante el Estado y la sociedad. *Íd.*

incluye, claro está, la libertad de los padres y las madres [de ambos, no de uno solo] de tomar decisiones respecto a sus hijos e hijas.[6] *Rexach v. Ramírez*, 162 DPR 130, 148 (2004). Véase, además, *Washington v. Glucksberg*, 521 US 702, 720 (1997); *Lassiter v. Department of Social Services*, 452 US 18, 27 (1981).

Es, precisamente, en ese contexto, -- entiéndase, en el de la libertad de los padres y madres para tomar decisiones sobre sus hijos e hijas --, que varias cortes estatales hermanas han reconocido el derecho de los primeros a escoger el nombre y los apellidos de los segundos. Véase, *Doherty v. Wizner*, 210 Or.App. 315, 322 (2006); *Jech v. Burch*, 466 F.Supp 714, 719 (D.C. Hawaii, 1979); *Secretary of Com. v. City Clerk of Lowell*, 373 Mass. 178, 190 (1977). En específico, esas cortes hermanas han afirmado que "the right of privacy under the Fourteenth Amendment´s due process clause protects parent´s freedom to choose their children's name". C.M. Durkin, *Naming nonmrital children: birth certificates and*

---

[6] Sobre ello, en *Rexach v. Ramírez*, 162 DPR 130, 145 (2004), precisamos que "[e]l Tribunal Supremo federal ha reconocido como derechos fundamentales aquellos expresamente consagrados en la Primera Enmienda, además de varias categorías que han sido reconocidas como derechos fundamentales implícitos. Éstos son: [...] el derecho a la intimidad, que incluye la libertad decisoria respecto al cuido y a la educación de los hijos".

En específico, al aplicar los postulados del debido proceso de ley a las relaciones familiares, el Tribunal Supremo de Estados Unidos ha interpretado que dentro del concepto 'libertad' de la Decimocuarta Enmienda están incluidos, entre otros, el derecho a casarse, a establecer un hogar, a procrear y a criar a los hijos. *López v. ELA*, *supra*, pág. 295; *Rexach v. Ramírez*, *supra*, pág. 146.

Cónsono con ello, hemos sentenciado que "indudablemente en Puerto Rico los padres y madres tienen un derecho fundamental a criar; cuidar y custodiar a sus hijos, protegido tanto por la Constitución del Estado Libre Asociado de Puerto Rico como por la Constitución de Estados Unidos". *Rexach v. Ramírez*, *supra*, pág. 148.

*name change petitions*, en Paternity and the Law of Parentage
in Massachusetts, 3ra ed., Boston, Northeastern University
School of Law, 2018, pág. 4.

B.

Establecido lo anterior, precisa señalar aquí que el
nombre es el medio por el cual se identifica a las personas,
no solo por su individualidad, sino en sus relaciones de
familia. R.E. Ortega Vélez, *25 lecciones derecho de familia*,
9na ed. rev., San Juan, Ed. SITUM, 2022, pág. 76. Esta función
individualizadora se predica tanto con relación al nombre
propio, como respecto del apellido o apellidos. M.A. Novales
Alquézar, *Orden de apellidos de la persona nacida*, 30 (Núm.
2) Rev. Chilena de Derecho, 2003, pág. 321.

Al respecto, y a raíz del desarrollo de los derechos
fundamentales en el ámbito internacional, se ha reconocido el
derecho de toda persona a poseer un nombre como una
manifestación del derecho de la personalidad, y a que éste
sea protegido.[7] M.R. Garay Aubán, *Código Civil de Puerto Rico
2020 y su historial legislativo*, 1ra ed., San Juan, Ed. SITUM,
2020, T. 1, pág. 58. Ello, pues, se ha reconocido el nombre

---

[7] Así, por ejemplo, la Declaración de los Derechos del Niño, aprobada por
la Asamblea General de las Naciones Unidas el 20 de noviembre de 1959
reconoce que "[e]l niño tiene derecho desde su nacimiento a un nombre".
A.G. res. 1386 (XIV), 14 U.N. GAOR Supp. (No. 16) p. 19, ONU Doc. A/4354
(1959).

En consonancia, la Convención sobre los Derechos del Niño prescribe que
"[e]l niño será inscripto inmediatamente después de su nacimiento y
tendrá derecho desde que nace a un nombre". J. Mendoza Argomedo, *El
derecho fundamental a elegir el orden de los apellidos*, 130 Gaceta
Constitucional 148, pág. 151 (oct. 2018).

Por su parte, el Art. 18 de la Convención Americana sobre Derechos Humanos
establece que toda persona tiene derecho a un nombre propio y a los
apellidos de sus padres o al de uno de ellos. *Íd.*, pág. 152.

como un atributo inherente de la persona y, por tanto, un aspecto importante de su identidad personal. E.A. Fernández Pérez, *El nombre y los apellidos. Su regulación en derecho español y comparado*, [s. Ed.], Universidad de Sevilla, 2015, págs.739-741, https://core.ac.uk/download/pdf/51395097.pdf.

En esa dirección, en nuestra jurisdicción, "[t]oda persona natural tiene el derecho a tener y a proteger su nombre, [el cual] debe[rá] inscribirse en el Registro Demográfico de conformidad con la ley". Art. 82 del Código Civil de 2020 (31 LPRA sec. 5541). En virtud de ello, una vez se le asigna a la persona un nombre, el cual la ha de distinguir en su entorno social y jurídico o como parte de la sociedad en la que vive, ésta tiene derecho a exigir su reconocimiento y exclusividad. Garay Aubán, *Código Civil de Puerto Rico 2020 y su historial* legislativo, op. *cit.*, págs. 58-59.

En esa línea, es menester señalar que de conformidad con lo dispuesto en el Art. 83 del Código Civil de 2020 (31 LPRA sec. 5542), el "nombre de una persona comprende el nombre propio o individual unido al primer apellido de sus progenitores". En cuanto a esto último, debemos mencionar que en nuestro ordenamiento jurídico rige un *sistema dual* en la atribución de los apellidos, el cual presupone que el nombre está compuesto de dos (2) apellidos que, como regla general, serán determinados por la filiación de la persona. Art. 557 del Código Civil de 2020 (31 LPRA sec. 7103). Es decir, "de la filiación depende el nombre que pueda y deba utilizar el

individuo y la integración de [é]ste en el grupo familiar". Ortega Vélez, *op. cit.*, pág. 222.

Sabido es que, la filiación -- la cual tiene lugar por vínculo genético, por métodos de procreación asistida o por adopción -- "es el estado civil de la persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o de otro hecho legalmente suficiente al efecto". *Castro v. Negrón*, 159 DPR 568, 579-580 (2003). Véase, además, Art. 556 del Código Civil de 2020 (31 LPRA sec. 7102). Ha sido en virtud de lo anterior que esta Curia ha sentenciado que la filiación "no se limita a establecer vínculos con el propósito de identificar relaciones entre partes de la sociedad, sino que va dirigida a imponer derechos y obligaciones concretas de consecuencias permanentes". *Sánchez Rivera v. Malavé Rivera*, 192 DPR 854, 862 (2015).

En ese sentido, y en lo aquí pertinente, el Art. 558 del Código Civil de 2020 (31 LPRA sec. 7104), establece como parte de los derechos que surgen de la filiación, el derecho del hijo o la hija a "llevar el apellido de cada progenitor". Como se puede apreciar, de lo antes dicho claramente se desprende que la asignación de los apellidos no es más que un efecto del nexo jurídico o el parentesco existente entre los progenitores y su descendencia. M.R. Garay Aubán, *Código Civil 2020 y su historial legislativo*, 2da ed., San Juan, Ed. SITUM, 2021, T. 2, pág. 378.

Ahora bien, en cuanto a esto último "[s]i uno solo de los progenitores reconoce e inscribe a la persona nacida, lo hace con sus dos apellidos en el mismo orden del progenitor que lo reconoce. El reconocimiento posterior del otro progenitor justifica la sustitución de uno de los apellidos en el nombre de la persona por el del progenitor que le reconoce con posterioridad".[8] Art. 84 del Código Civil de 2020 (31 LPRA sec. 5542). Ello pues, estando la filiación determinada por ambas líneas, cada uno de los progenitores tienen derecho a transmitir su apellido al hijo o a la hija. M.S. Quicios Molina, *Orden de los apellidos: autonomía privada, interés superior del menor y no discriminación por razón de sexo*, Derecho Privado y Constitución, 39, 2021, pág. 257 en https://www.cepc.gob.es/sites/default/files/2021-12/39539dpyc3902quicios-molina.pdf.

Lo anterior va atado de la mano con lo estatuido en el Art. 578 del Código Civil de 2020 (31 LPRA sec. 7181), el cual preceptúa que, "[e]l tribunal ordenará la corrección de los datos inscritos en el certificado de nacimiento del hijo [o hija -- incluyendo lo relativo a los apellidos --] luego de rebatida la presunción de paternidad o de maternidad o

---

[8] Precisa señalar que lo relativo al reconocimiento voluntario fue incorporado en el Art. 19-A de la Ley del Registro General Demográfico de Puerto Rico (24 LPRA sec. 1133a), la cual también establece que, si el nacimiento es reconocido por uno solo de los progenitores, será obligación del Registro Demográfico, al momento de la inscripción, realizar la inscripción haciendo constar los dos apellidos del único que lo reconoce, cuando así lo requiera dicho padre o madre.

De igual manera, el precitado artículo dispone que, si con posterioridad a la inscripción surgiera la intención de un reconocimiento voluntario, el Registro Demográfico viene en la obligación de sustituir el apellido del padre o la madre de acuerdo con la documentación evidenciada. *Íd*.

luego de anulado el reconocimiento voluntario". Ello es tarea del Registro Demográfico.

C.

i.

Y es que, como bien sabemos, en nuestra jurisdicción, el Registro Demográfico, -- habilitado por la *Ley del Registro General Demográfico de Puerto Rico*, Ley Núm. 24 de 22 de abril de 1931 (24 LPRA sec. 1041 *et seq.*) (en adelante, "Ley del Registro Demográfico") --, es la entidad que tiene a su cargo "las inscripciones de las circunstancias del nacimiento, el nombre con que es inscrita la persona; el sexo de la persona en el nacimiento, el estado filiatorio natural o por adopción", entre otras funciones. Art. 682 del Código Civil de 2020 (31 LPRA sec. 7632). En específico, y en lo aquí pertinente, el Art. 19 de la Ley del Registro Demográfico (24 LPRA sec. 1133), estatuye que el certificado de nacimiento contendrá, entre otra información, el "nombre y apellidos del niño [o niña]".

Sin embargo, no empecé a que de las anteriores disposiciones estatutarias, -- entiéndase el Código Civil de 2020, *supra*, y la Ley del Registro Demográfico, *supra* --, claramente se desprende que, una vez establecida la doble filiación, los hijos e hijas ostentarán los apellidos de ambos progenitores, lo cierto es que dichos estatutos nada disponen sobre el orden en que deben ser designados esos apellidos. Al profundizar sobre el particular, la Dra. Migdalia Fraticelli

Torres, prestigiosa estudiosa de estos temas, destaca la importancia de, al atender el mismo, considerar minuciosamente,

> [l]a facultad de los padres [y las madres] para escoger el orden [de] los apellidos de los hijos e hijas […]. [Pues, a su juicio] [e]l orden que exige la colocación del apellido paterno antes que el materno preserva vestigios de discriminación por género que el Derecho debe proscribir. [Al respecto, menciona que] [e]sta medida se ha adoptado o permitido en otras jurisdicciones con marcada aceptación social. M. Fraticelli Torres, *Relevancia actual y secuela jurisprudencial de Ocasio v. Díaz*, 50 Rev. Der P.R. 101, 121-122 (2010).

Es, precisamente, ese vacío en nuestro ordenamiento legal el que este Tribunal estaba llamado a atender en el presente caso. Como algunos miembros de esta Curia rehusaron a así hacerlo, desde la disidencia -- y a través del tratamiento que se les ha dado a controversias como éstas en otras jurisdicciones, como lo son los Estados Unidos, Europa y América Latina -- procedemos a ello.

ii.

De entrada, y ya más en lo relacionado a la regulación del orden de los apellidos, tal y como se concibe hoy en día, debemos mencionar que, -- en el ámbito internacional --, este tema ha sido producto de una larga evolución que, en todo momento, ha procurado asegurar condiciones de igualdad entre hombres y mujeres. M. Estévez López, *La ley aplicable al nombre y apellidos en derecho internacional privado español*, Universidad Pontificia, 2019, pág. 57 en https://repositorio.comillas.edu/rest/bitstreams/271701/ret

rieve. El resultado de ese proceso, el cual ha tomado tiempo, ha sido la promulgación de estatutos dirigidos a desterrar formalmente del ordenamiento la subordinación del apellido materno frente al paterno y, de esta forma, lograr la plena equiparación entre los progenitores a la hora de transmitir sus apellidos a sus hijos o hijas. Quicios Molina, *op. cit.*, pág. 260.

En ese contexto, para la correcta disposición de las controversias ante nuestra consideración, es tarea obligatoria explorar, -- tal como lo han sugerido prestigiosos tratadistas de este tema --, cómo otras jurisdicciones -- particularmente de los Estados Unidos, Europa y América Latina -- han incorporado los mencionados principios de igualdad en la delicada tarea de atribuir los apellidos a las hijas e hijos habidos en determinadas familias. Particularmente, en aquellos escenarios en los cuales ambos progenitores tienen derecho a transmitir su apellido al hijo o a la hija, pero no logran ponerse de acuerdo sobre el orden en que han de imponer su respectivo apellido al menor de edad.

Así las cosas, en Estados Unidos, por ejemplo, en el estado de New York, la legislación ha establecido que, los menores de edad podrán ser inscritos con cualquiera de los apellidos de los progenitores, o una combinación de éstos ("the child may bear the last name of either parent, or any combination thereof, which name shall not affect the legal status of the child."). N.Y. Pub. Health Law sec. 4135-b.

**Asimismo, en el mencionado estado, una vez inscrito el menor con determinado apellido o apellidos, éstos podrán modificarse si se demuestra que es en beneficio del mejor interés del menor de edad.** Véase, *Matter of Bafumo*, 171 A.D.3d 1328 (3 Dept. NY 2019); *In re John Phillip M.-P.*, 41 A.D.3d 720, (2 Dept. NY 2007); *Mercado v. Townsend,* 225 A.D.2d 555 (2 Dept. NY 1996). En todo momento, teniendo como máxima, claro está, que "neither parent has a superior right to determine surname of child, and question is always whether best interests of child will be served by proposed change". *Cohan v. Cunningham,* 104 A.D.2d 716 (4 Dept. NY 1984).

**Pero no solo los tribunales estatales de New York han optado por emplear dicho análisis, -- entiéndase, evaluar el mejor interés del menor al momento de disponer de asuntos como los que hoy están aquí bajo estudio --, el Tribunal Supremo de New Jersey también lo ha hecho.** *Gubernat v. Deremer*, 140 N.J. 120, 139 (1995). En específico, ha dictaminado que los apellidos de un menor solo serán alterados cuando el cambio promueve su mejor interés ("once a surname has been selected for the child, be it the maternal, paternal, or some combination of the child´s parents' surnames, a change in the child´s surname should be granted only when the change promotes the child´s best interests."). *Íd.* citando a *In re Saxton*, 309 N.W.2d 298, 301 (Minn. 1981).

**En los estados de Maine, Massachusetts, New Hampshire y Rhode Island, -- que, junto a Puerto Rico, forman parte del Primer Circuito de Apelaciones de los Estados Unidos --, tanto**

**la legislación, como la jurisprudencia, ha establecido el criterio del mejor interés del menor como el factor principal a evaluar en aquellas instancias en las cuales los progenitores no están de acuerdo sobre el orden en que han de asignar sus respectivos apellidos a sus hijos e hijas.** Por ejemplo, en el estado de Maine al evaluar el mejor interés del menor, en situaciones como la antes descrita, los tribunales están obligados a tomar en consideración diversos factores como lo son: (1) la preferencia expresa del menor, si éste tiene la edad y madurez suficientes para articular su preferencia; (2) si el menor tiene catorce (14) años de edad o más, si éste consiente o se opone a la petición del cambio; (3) el grado en que el menor usa un nombre en particular; (4) si el apellido propuesto es diferente al de cualquiera de los hermanos o hermanas del menor y el grado en que el menor se asocia e identifica con éstos; (5) las dificultades, hostigamiento o vergüenza que pueda experimentar el menor de edad por el apellido actual o propuesto, (6) además de cualquier otro factor que el tribunal considere relevante para el mejor interés del menor.[9] 18-C MRSA sec. 1701 (ME).

---

[9] Asimismo, al determinar si el cambio en el orden de los apellidos responde a los mejores intereses del menor, algunos tribunales han considerado también los factores siguientes:

> 1) the identity and preference of the custodial parent; 2) the avoidance of embarrassment inconvenience, or confusion; 3) identification of child as being part of distinct family unit; 4) the age of the child and length of time the child has used surname; 5) the preferences of the child; 6) the effect of a name change on the relationship between the child and each parent; 7) parental misconduct; 8) the level of support for and contact with the child; 9) the motivation of the parent seeking the name change or the parent seeking to oppose it; 10) the community reputation associated with the names at issue; 11) assurance of the custodial parent that she or he

De igual forma, la jurisprudencia en el estado de Massachusetts ha sido clara en que, cuando los progenitores no están de acuerdo sobre cuál apellido asignarle a su hijo o hija, se deberá realizar un análisis del mejor interés del menor, en conjunto con otros factores. *Gomes v. Candido*, 829, 173 N.E.3d 769, 773 (MA 2021); *Cormier v. Quist*, 933 N.E.2d 153 (MA 2010), citando a *Petition of Two Minors for Change of Name*, 844 N.E.2d 710 (MA 2006). Además, en cuanto al peso de la prueba, "[t]he person filing the petition bears the burden of demonstrating that the name change is in the child's best interests". *Gomes v. Candido*, *supra*, pág. 773. Un acercamiento similar ha sido el empleado en la jurisdicción de New Hampshire. Véase, *In re Goudreau*, 55 A.3d 1008, 1010 (NH 2012).

Por su parte, el Tribunal Supremo de Rhode Island -- hace más de tres décadas -- sentenció que,

> [t]he standard to be employed in surname disputes was well stated in the Schiffman case, where the court observed, **"The sole consideration when parents contest a surname should be the child's best interest."** *Schiffman*, 28 Cal.3d at 647, 169 Cal.Rptr. at 922, 620 P.2d at 583. (Escolios omitidos) (Énfasis nuestro). *Ribeiro v. Monahan*, 524 A.2d 586, 587 (R.I. 1987).[10] Véase, además, *Branch v. Quattrocchi*, 793 A.2d 203 (R.I. 2002).

---

will not change hers or his own surname or the child´s surname; 12) important ties to family heritage, ethnic, identity and cultural values. *Doherty v. Wizner*, *supra*, págs. 324-326. Véase, además, *In re H.S.B.*, 401 S.W.3d 77, 84 (2011).

[10] Ello, al razonar que,

> [t]he traditional view at common law was that a child bore the surname of his or her father. […]. We see no necessity for giving an extensive historical review of the changes that have occurred in women's status since the days of common law by the enactment of such measures as the Married Women's Act, the statutory prohibition of wage differentials based on sex, or no-fault divorce legislation. It is our belief that today

En fin, en los Estados Unidos, al evaluar el llamado "mejor interés del menor" los jueces y juezas han considerado, en términos generales, el impacto del nombre en la relación del hijo o la hija con ambos progenitores, así como su impacto en las experiencias y en la identidad personal del menor de edad ("the child´s best-interest calculus should consider the impact of the name on both parent-child relationships, as well as the impact on the child´s personal identity and experiences.").[11] Durkin, *op. cit.*, pág. 15. Ello pues, "a name change is a significant event for a child, even for very young children. A name originally given to a child carries a great personal significance [because] is an important part of the identity formation process." *Emma v. Evans*, 215 N.J. 197, 214-215 (2013). Por tanto,

> [a]ccepting the importance of a name given to a child, even a very young child in the process of forming his or her identity through the elemental process of learning his or her name, the decision

---

the basis for the patrimonial control of surnames has practically disappeared. *Ribeiro v. Monahan*, *supra*, pág. 587.

[11] Es decir, al resolver controversias sobre el apellido o los apellidos que ostentará el menor de edad los tribunales federales han aplicado "the best-interests-of-the-child standard free of gender-based notions of parental rights." *Gubernat v. Deremer*, *supra*, pág. 141. Sobre el particular, en *Doherty v. Wizner*, *supra*, págs. 323-324, la corte de apelaciones de Oregon señaló que:

> [t]he right to name a child is a privilege belonging equally to both parents. Courts across this country have set aside those naming practices of the past that endorse presumptions and preferences that favor one parent over another based upon marital status, gender, or custodial designation, because such presumptions and preferences are not consistent with determining the best interest of the child. These outdated naming practices have been replaced with a requirement that the court determine what is in child´s best interest, avoiding any interests not supported by the evidence or founded on presumptions that favor one parent over another.

En definitiva, "[t]he child´s best interest is the primary concern[,] not the interests of the parents." *In re H.S.B.*, *supra*, pág. 83.

to alter a child´s name is, a noted, a significant moment in a young life. *Íd.*, pág. 215.

Dicho ello, en España, país que forma parte del continente europeo, el Art. 109 de Código Civil español dispone que:

> [l]a filiación determina los apellidos con arreglo a lo dispuesto en la ley.
>
> Si la filiación está determinada por ambas líneas, **los progenitores de común acuerdo podrán decidir el orden de transmisión de su respectivo primer apellido, antes de la inscripción registral. Si no se ejercita esta opción, regirá lo dispuesto en la ley.**
>
> El orden de apellidos inscrito para el mayor de los hijos regirá en las inscripciones de nacimiento posteriores de sus hermanos del mismo vínculo.
>
> El hijo, al alcanzar la mayoría de edad, podrá solicitar que se altere el orden de los apellidos. (Énfasis suplido). Ley Núm. 40/1999, de 6 de noviembre. Véase, además, J. Mendoza Argomedo, *El derecho fundamental a elegir el orden de los apellidos*, 130 Gaceta Constitucional 148, pág. 154 (oct. 2018).

En esa línea, es el Art. 49 de la Ley 20 de 21 de julio de 2011, el que en España establece el curso a seguir en aquellos escenarios en los cuales los progenitores no coinciden respecto al orden de transmisión de su primer apellido. Mendoza Argomedo, *supra*, pág. 154. En lo pertinente, el artículo de referencia dispone que:

> **[e]n caso de desacuerdo o cuando no se hayan hecho constar los apellidos en la solicitud de inscripción, el Encargado del Registro Civil requerirá a los progenitores, o a quienes ostenten la representación legal del menor, para que en el plazo máximo de tres días comuniquen el orden de apellidos. Transcurrido dicho plazo sin comunicación expresa, el Encargado acordará el orden de los apellidos atendiendo al interés superior del menor.**

En los supuestos de nacimiento con una sola filiación reconocida, ésta determina los apellidos. El progenitor podrá determinar el orden de los apellidos. (Énfasis suplido). *Íd.*

**Ahora bien, es menester señalar aquí que, en España, una vez determinada judicialmente la paternidad, se ha favorecido, al amparo del interés superior del menor, preservar el apellido con el que fue identificado el menor desde la inscripción de su nacimiento en el Registro Civil.** STS 620 11 de noviembre de 2015. Ello pues, el derecho al nombre, como derecho de la personalidad, justifica que los menores mantengan la identidad que han ostentado desde su nacimiento. Quicios Molina, *op. cit.*, pág. 276.

Asimismo, en Portugal, es norma firmemente establecida que el hijo o hija deberá llevar los apellidos del padre y de la madre, o sólo los de uno de ellos, y que esa elección corresponde a ambos progenitores. Mendoza Argomedo, *supra*, pág. 155. **No obstante, en caso de desacuerdo entre éstos, la legislación dispone que será el juez o la jueza quien decidirá, de acuerdo con los intereses del hijo o de la hija.** *Íd.*

De forma similar, en Francia se ha mantenido el principio de libre elección del apellido de familia cuando se determina conjuntamente la doble filiación, de modo que los progenitores pueden decidir únicamente el apellido del padre o el de la madre, o la unión de ambos en el orden deseado; a falta de declaración conjunta, el apellido será el del progenitor cuya filiación se determine en primer lugar --

salvo acuerdo en contrario cuando se determina la segunda filiación --, o el apellido del padre si se determinan ambas filiaciones de manera simultánea. Quicios Molina, *op. cit.*, pág. 255. **Sin embargo, en caso de desacuerdo cuando se establezca simultáneamente la filiación, el hijo o la hija llevará el primer apellido de cada progenitor sucesivamente por orden alfabético.** *Íd.*

Por su lado, en Holanda ambos progenitores podrán elegir el apellido que ostentará el hijo o hija al momento de inscribirlo. Dutch Civil Law, *Act conflict of law rules for names*, http://www.dutchcivillaw.com/actconflictlawnames.htm (última visita, 26 de abril de 2023). Ahora bien, si los progenitores no indican el apellido seleccionado para el menor de edad,

> the Registrar will mark as surname for the child in its birth certificate: a. the surname of the father in the event that the child has come to stand in a legal familial relationship to both parents through birth; b. the surname of the mother in the event that one parent and its spouse or registered partner, not being the parent of the child, by operation of law are exercising or will exercise jointly parental authority over the child. *Íd.*

A su vez, en Holanda si únicamente se ha establecido la filiación materna, el hijo o hija será inscrito con el apellido de la madre. *Íd.* **Además, si posteriormente el menor es reconocido por el padre o se determina la paternidad judicialmente, éste conservará el apellido de la madre, salvo que los progenitores por común acuerdo declaren conjuntamente que el hijo o la hija llevará el apellido del padre.** *Íd.*

De otra parte, y al adentrarnos en cómo se tratan controversias como las que hoy nos ocupan en algunos países de América Latina, notamos que en Argentina, por ejemplo, el Art. 64 del Código Civil y Comercial Nacional, estatuye que "[e]l hijo [o la hija] matrimonial lleva[rá] el primer apellido de alguno de los cónyuges; **en caso de no haber acuerdo, se determina por sorteo realizado en el Registro del Estado Civil y Capacidad de las Personas**". (Énfasis suplido). Mendoza Argomedo, *supra*, pág. 152. Asimismo, el mencionado artículo precisa que todos los hijos e hijas de un mismo matrimonio deberán llevar el apellido o los apellidos elegidos para el primer hijo o hija. *Íd*.

No obstante, el referido cuerpo de ley dispone que el hijo o hija "con un solo vínculo filial lleva[rá] el apellido de ese progenitor". *Íd*. **Sin embargo, si la segunda filiación se establece posteriormente, los progenitores acordarán el orden de los apellidos y, a falta de acuerdo, el juez o la jueza determinará el orden de los apellidos, según el mejor interés del menor**. *Íd*.

En Chile, por otro lado, en la transmisión de los apellidos de los progenitores al hijo o hija, aplican las reglas siguientes:

> 1. En la inscripción de nacimiento del primero de los hijos comunes, los progenitores determinarán, de común acuerdo, el orden de transmisión de sus respectivos primeros apellidos, que valdrá para todos sus hijos comunes. **En caso de no manifestarse acuerdo al momento de inscribir al primero de los hijos comunes, se entenderá su voluntad de que el orden de los apellidos sea determinado mediante sorteo ante el Oficial del Registro Civil.**

2. En toda inscripción de nacimiento en que al tiempo de la inscripción quede determinada la filiación del nacido respecto de ambos progenitores, el oficial del Registro Civil procederá según el orden de los apellidos fijado en la inscripción de nacimiento del primero de los hijos comunes de dichas personas; y si no tuvieren más hijos comunes, según el orden que se determine al practicarse la inscripción, de conformidad a lo dispuesto en la regla precedente.

3. En la inscripción de nacimiento de un hijo cuya filiación al tiempo de la inscripción quede determinada sólo respecto de uno de los progenitores, se inscribirá al nacido con el respectivo primer apellido de dicho progenitor. En este caso, cuando con posterioridad obrare determinación de la filiación no determinada al tiempo de la inscripción de nacimiento, si hubiere otro u otros hijos comunes de dichos progenitores, se estará al orden de los apellidos fijado en la inscripción de nacimiento del primero de sus hijos comunes. **Si, por el contrario, no hubiere más hijos comunes de dichos progenitores, el primer apellido del progenitor que quedó determinado al momento de la inscripción del nacimiento antecederá al otro apellido, a menos que, no habiendo el hijo alcanzado la mayoría de edad, los progenitores manifiesten, de común acuerdo, su voluntad de que se proceda con el orden inverso.** Ley N° 21.334 de 11 de enero de 2022 en https://www.bcn.cl/leychile/navegar?idNorma=1159523 (última visita, 29 de abril de 2023).

Por su parte, en México el Art. 58 del Código Civil Federal dispone que:

[e]l acta de nacimiento se levantará con asistencia de dos testigos. Contendrá el día, la hora y el lugar del nacimiento, el sexo del presentado, **el nombre y apellidos que le correspondan**; asimismo, la razón de si se ha presentado vivo o muerto; la impresión digital del presentado. Si éste se presenta como hijo de padres desconocidos, el Juez del Registro Civil le pondrá el nombre y apellidos, haciéndose constar esta circunstancia en el acta. (Énfasis suplido). E. Delgado Augusto de Jesús, *La libertad de un ciudadano peruano de poder establecer la prelación en cuanto al apellido paterno y el apellido paterno*, Universidad Católica de Santa María, Perú, 2018, pág. 94.

Lo anterior, es así tras la primera sala de la Suprema Corte de Justicia de la nación declarar inconstitucional una parte del precitado artículo que ordenaba que los menores de edad fueran inscritos con el apellido paterno primero y el materno segundo. *Íd*. "Con esta última se estableció que el derecho de los [progenitores] a elegir el orden de los apellidos de sus hijos [ e hijas] se encuentra tutelado por el derecho al nombre, en relación con el derecho a la vida privada y familiar". *Íd*.

En virtud de ello, recientemente el Senado de la República de México, -- con 80 votos a favor y 17 abstenciones -- avaló un proyecto para reformar el mencionado Art. 58 del Código Civil Federal, a fin de que, en el acta de nacimiento, los progenitores puedan decidir el orden de prelación de los apellidos de sus hijos e hijas. Senado de la República, *Aprueba Senado que padres decidan orden de prelación de apellidos de sus hijos* (21 de febrero de 2023) en https://comunicacionsocial.senado.gob.mx/informacion/comuni cados/5091-aprueba-senado-que-padres-decidan-orden-de-prelacion-de-apellidos-de-sus-hijos. En específico, la reforma establece que el acta de nacimiento contendrá "los nombres propios y apellidos que les correspondan en el orden de prelación que los progenitores convengan, pudiendo elegir de entre los apellidos maternos y paternos". *Íd*.

En Colombia, por último, el Art. 53 del Estatuto del Registro del Estado Civil de las personas, *infra*, dispone lo siguiente:

[e]n el Registro Civil de Nacimiento se inscribirán como apellidos del inscrito(a), el primer apellido de la madre y el primer apellido del padre, en el orden que decidan de común acuerdo. **En caso de no existir acuerdo, el funcionario encargado de llevar el Registro Civil de Nacimiento resolverá el desacuerdo mediante sorteo […].** A falta de reconocimiento como hijo(a) de uno de los padres se asignarán los apellidos del padre o madre que asiente el Registro Civil de Nacimiento.

[…]

**Para el caso de los hijos con paternidad o maternidad declarada por decisión judicial se inscribirán como apellidos del inscrito los que de común acuerdo determinen las partes. En caso de no existir acuerdo se inscribirá en primer lugar el apellido del padre o madre que primero lo hubiese reconocido como hijo, seguido del apellido del padre o la madre que hubiese sido vencido en el proceso judicial.** (Énfasis suplido). Art. 53 del Estatuto del Registro del Estado Civil de las personas, Decreto 1260 de 1970, julio 27.

Como se puede colegir de lo antes señalado, diversos países han adoptado un régimen de atribución de los apellidos que favorece la libertad de los progenitores en elegir el orden de los apellidos de sus hijos e hijas; el cual regirá para los hijos o hijas posteriores de un mismo vínculo. No obstante, en defecto de acuerdo entre éstos respecto al orden en que han de transmitir su primer apellido al hijo o hija, algunas jurisdicciones han recurrido al mecanismo del sorteo, al orden alfabético o al criterio del mejor bienestar del menor, respetando así los principios de igualdad que subyacen en el momento que las referidas naciones del mundo abordan este tema.

D.

Establecido lo anterior, y para concluir, conviene recordar aquí que, en nuestra jurisdicción, la unidad de la familia, la institución de la patria de potestad y las relaciones paternofiliales son asuntos que están revestidos de un alto interés público y social, en beneficio, no sólo de los menores de edad, sino también del estado. *Martínez v. McDougal*, 133 DPR 228, 231 (1993); *Guerra v. Ortiz*, 71 DPR 613, 623 (1950). **Por ello, hemos sido consecuentes al sostener que, al adjudicar controversias relacionadas con menores, los tribunales deben guiarse "por el principio de asegurar el bienestar y los mejores intereses de éstos".** *Rexach v. Ramírez*, *supra*, págs. 147-148. Véase, además, *Candelario Vargas v. Muñiz Díaz*, 171 DPR 530, 547 (2007); *Ferrer v. González*, 161 DPR 172 (2004).

Así, por ejemplo, cuando los progenitores no logran llegar a un acuerdo respecto a ciertos aspectos que afectan directamente a los menores de edad, los tribunales, en protección de esos intereses y en el ejercicio del poder de *parens patriae*, tienen amplia facultad y discreción para adjudicar la controversia. *Martínez v. Ramírez Tió*, 133 DPR 219, 225-226 (1993); *Sterzinger v. Ramírez*, 116 DPR 762, 778 (1985). **A esos fines, "deberá[n] considerar todos los factores que tenga[n] a su alcance para lograr la solución más justa".** *Sterzinger v. Ramírez*, *supra*, pág. 778. Véase, *Marrero Reyes v. García Ramírez,* 105 DPR 90, 105-106 (1976).

Véase, además, *Franz v. United States*, 707 F.2d 582, 601 (1983).

Es, pues, a la luz de la normativa antes expuesta, y no de otra, que procedía disponer de la causa de epígrafe. Como una mayoría de este Tribunal no lo hizo, -- desde la disidencia -- procedemos a así hacerlo.

III.

Como mencionamos, en el presente caso, el matrimonio Jiménez Rodríguez aduce que el Tribunal de Apelaciones erró al concluir que, ante la ausencia de un estatuto que regulara el orden en que han de imponerse los apellidos de cada progenitor a un menor de edad, conforme a la doctrina del uso y la costumbre, procedía inscribir al menor MMR con el apellido paterno previo al materno. Tiene razón el matrimonio Jiménez Rodríguez.

Para llegar a la anterior conclusión basta con señalar que, si bien es cierto que en nuestra jurisdicción los estatutos que gobiernan la presente controversia requieren que los menores de edad sean inscritos en el Registro Demográfico con los apellidos de ambos progenitores cuando se establece la doble filiación, igualmente cierto lo es que, respecto al orden en que deberán constar los apellidos del menor nuestro ordenamiento jurídico guarda total silencio. La doctrina del uso y la costumbre, por muchas razones que ya hemos explicado, no era el medio idóneo para disponer de los asuntos ante nos, los cuales están revestidos de importantes protecciones constitucionales.

**Y es que, de conformidad con la normativa constitucional, legal y jurisprudencial antes expuesta, ha quedado claramente demostrado aquí que, -- una vez establecida la doble filiación de un hijo o hija --, en ausencia de acuerdo entre los progenitores para establecer el orden de los apellidos de éstos, debe prevalecer el orden de los apellidos que responda a los mejores intereses del menor.[12] Particularmente, a su derecho a la dignidad, a la intimidad, al libre desarrollo de su personalidad y a su propia imagen.**

Para realizar dicho ejercicio, y similar a como ha ocurrido en otras jurisdicciones, el juzgador o juzgadora podría considerar, entre otros, los siguientes factores: la edad del menor y el tiempo que éste ha utilizado el apellido, la preferencia del niño o niña, el efecto de un cambio de nombre en la relación entre el menor de edad y cada uno de los progenitores, el nivel de apoyo y contacto de los progenitores con el niño o niña, la preferencia del padre o madre custodio, la motivación del progenitor que procura el cambio o del que se opone a dicho cambio, y los vínculos del menor de edad con el patrimonio familiar, étnico, identidad y valores culturales.

---

[12] En definitiva, los esfuerzos deben "procurar en la medida de lo posible que se logre un acuerdo, y, si no fuera así, optar por un criterio imparcial y que sea conforme con -o que no contradiga- el interés del menor. **Lo cual, por cierto, lleva a excluir el criterio rígido de que, en caso de discrepancia, se utilice el orden alfabético, puesto que, si las partes conocen eso de antemano, a una de ellas (a la que favorezca el orden alfabético) se le estaría dando un incentivo para no esforzarse en llegar a un acuerdo".** (Énfasis suplido). Atienza, *supra*, págs. 101-102.

Así pues, de haberse realizado el referido análisis en lo relacionado al litigio ante nos, por la información que se desprende del expediente ante nuestra consideración, no hubiese sido errado ordenar -- como correctamente lo sentenció el Tribunal de Primera Instancia -- que el menor MMR mantuviese como primer apellido el materno y que se sustituyese el segundo apellido con el que fue inscrito éste al nacer (entiéndase, Rodríguez) por el apellido paterno (entiéndase, Cintrón). De ahí que, el nombre del menor pudiese constar en el Registro Demográfico como, MMR Jiménez Cintrón.[13]

Sin embargo, y muy lejos de lo anterior, con su silencio, algunos de mis compañeros y compañera de estrado avalan lo erradamente sentenciado por el Tribunal de Apelaciones sobre que, "[la doctrina] del uso y la costumbre en el País", justifica, sin más, la imposición del apellido paterno previo al materno. Al así proceder, perpetúan el discrimen por razón de sexo del que ha sido víctima la mujer.[14] Y lo que es peor, pasan por alto la máxima constitucional que establece que:

> **La dignidad del ser humano es inviolable. Todos los hombres [y mujeres] son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas.** Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad

---

[13] Precisa señalar aquí que, para mantener cierto orden en nuestro ordenamiento jurídico, tal y como ocurre en otras jurisdicciones, se sugiere que cualquier otro hijo o hija que hubiere entre esas mismas personas lleve el mismo orden de apellidos concedido al primero de ellos.

[14] El cual, en el caso de autos, únicamente podrá ser remediado -- en su día -- por el hijo o la hija al llegar a la mayoría de edad e invertir el orden de sus apellidos de conformidad con la Ley del Registro Demográfico, *supra*, o Ley de Asuntos No Contenciosos ante Notario, Ley Núm. 282-1999 (4 LPRA sec. 2155 *et seq*.).

humana.[15] (Énfasis suplido). Art. II, Sec. 1, Const. ELA, supra, pág. 275.

Lamentablemente hoy, los esfuerzos dirigidos a lograr la plena equiparación de la mujer y el hombre en los asuntos de familia se ven frustrados por la errónea aplicación de la doctrina del uso y la costumbre como fuente de derecho. **En definitiva, "aplicar una norma consuetudinaria (hablar de una costumbre 'socialmente aceptada') a los problemas surgidos como consecuencia de los profundos cambios que han transformado -o que están transformando- instituciones como la familia tradicional parece realmente fuera de lugar".** (Énfasis suplido). Atienza, *supra*, págs. 100-101.

Correspondía pues que este Tribunal, en lugar de avalar por inercia la conceptual y jurídicamente errada determinación del foro apelativo intermedio, reconociera estas trasformaciones y se rehusara a anteponer, sin más, el apellido paterno al materno. Al ello lamentablemente no ocurrir aquí, una vez más nos vemos en la obligación de disentir.

## IV.

En fin, y a modo de epílogo, desde este estrado apelativo de última instancia, le hacemos un recordatorio a los juristas

---

[15] Como parte del proceso de la Convención Constituyente, el Informe de la Comisión de Carta de Derecho expresó que:

> [l]a igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. **Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.** (Énfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 2561 (1951).

y las juristas del deber que se tiene de atender asuntos como los que hoy nos ocupan teniendo siempre presente los principios de igualdad que se derivan, tanto de la Constitución de los Estados Unidos de América, como de la Constitución del Estado Libre Asociado de Puerto Rico, nuestras más importantes fuentes de derecho. Las principales herramientas de trabajo de un juez o una jueza.

Controversias tan noveles como las que hoy atendimos continuarán surgiendo. Ello, en gran parte, atribuido a la rápida evolución en nuestra sociedad del concepto *familia*; en particular su composición, desarrollo, y diversas acepciones. Sobre el particular, hace una década atrás, la entonces Jueza Asociada de este Tribunal, Hon. Anabelle Rodríguez Rodríguez, nos señalaba que:

> **[a]ctualmente, aceptamos la existencia de varios tipos de familias.** A modo de ejemplo podemos enumerar las siguientes: la[s] familias monoparentales, producto de técnicas de reproducción asistida; aquellas en las que existen vínculos biológicos respecto de uno de sus miembros y no respecto del otro, lo que ocurre en instancias de reconocimientos de complacencia; familias en las que el menor convive sólo con su madre o con su padre; las llamadas familias reconstruidas, "en las que el menor puede pasar a convivir con un progenitor y su pareja o cónyuge", lo que se observa, por ejemplo, en ocasión de la custodia compartida, y las familias en las que el menor, fruto de la unión de un hombre y una mujer "(unidos previamente y posteriormente separados, divorciados o muerto uno de los dos) conviva con su progenitor o progenitora biológica y otra persona del mismo sexo de aquél".
>
> [...]
>
> Es por ello que circunscribir la categoría familia a aquella unión marital entre un hombre y una mujer con fines reproductivos exclusivamente resulta hoy

en día anacrónico. **Ignorar que el ámbito jurídico debe cristalizar los arreglos sociales existentes redundaría en impartir una Justicia a medias. No podemos negar lo que ocurre a nuestro alrededor, no existe una única y monolítica familia.**

[...]

**En este sentido, los tribunales no podemos aferrarnos a una realidad que dejó de ser tal. Se ha dicho que "[e]l más largo aprendizaje de todas las artes es aprender a ver".** (Citas y escolio omitidos, y énfasis suplido y en el original). ÁAR, Ex parte, 187 DPR 835, 1011-1012 (2013) opinión disidente de la Jueza Asociada Rodríguez Rodríguez.

Reconocido lo anterior, los juristas y las juristas están llamados a equiparar el derecho a esas nuevas realidades sociales. De no hacerlo así, estamos seguros que se estaría impartiendo "Justicia a medias".

Ahí el porqué de mi recordatorio. **El derecho, como las sociedades, evoluciona.**

                                        Ángel Colón Pérez
                                        Juez Asociado